**MIL–TECH SYSTEMS,
INCORPORATED,
Plaintiff,**

v.

**The UNITED STATES, Defendant.**

**No. 221–84C.**

United States Claims Court.

Aug. 3, 1984.

Jacob B. Pompan, Alexandria, Va., for plaintiff; Fred Israel, Israel & Raley, Chartered, Washington, D.C., of counsel.

Ronald A. Schechter, Washington, D.C., with whom was Acting Asst. Atty. Gen., Richard K. Willard, Washington, D.C., for defendant.

Laurence Schor, Schnader, Harrison, Segal & Lewis, Washington, D.C., for intervenor Telex Communications, Inc.

## OPINION

NETTESHEIM, Judge.

Plaintiff Mil-Tech Systems, Incorporated ("Mil-Tech"), seeks declaratory and injunctive relief, *inter alia,* prohibiting the Unit-

ed States Army, by its Communications-Electronics Command (the "Army"), from awarding the contract for 62,000 AS–1729/VRC antennas under Invitation for Bids No. DAAB07–83–B–B030 (the "IFB") to any entity other than Mil-Tech. The parties reduced their positions to cross-motions for summary judgment upon which argument has been heard. The issue of first impression is whether the contracting officer, in the absence of a statute or regulation prohibiting transfer of a bid, can find Mil-Tech ineligible for contract award because after bid opening Mil-Tech sold all its stock to another corporation for nominal consideration, although Mil-Tech continues to exist as a wholly-owned subsidiary of the acquiring corporation and the contract would be performed by Mil-Tech.

## FACTS

The following facts are found based on the parties' submissions.[1] Although the IFB issued on May 6, 1983, originally requested bids for a single-year award of 62,000 antennas and an alternate multi-year award of 92,000 antennas, the Army subsequently determined to make award only of the first alternate. Mil-Tech no longer claims entitlement to the second alternate, so the subject of this action accordingly is restricted to the 62,000 quantity. At bid opening Mil-Tech's bid of $8,248,200 for the 62,000 antennas was the lowest of the nine bidders—$193,100 lower than the next low bidder, intervenor Telex Communications, Inc. ("Telex"). Telex, it appears, also offered a discount of $84,413; even so, Mil-Tech submitted the low bid.

On the date of bid opening, June 20, 1983, Mil-Tech was a new business, notwithstanding that Mil-Tech's president had substantial prior experience doing business under a similar name in another state. Mil-Tech's Articles of Incorporation, describing itself as "an electronic and mechanical de-

1. The parties dispute the relevance of the facts. Mil-Tech argues that because it is today an existing corporation, ready, willing, and able to perform the contract, the circumstances of its history are not determinative. Defendant argues that Mil-Tech is ineligible for contract award,

because after bid opening Mil-Tech became a wholly-owned subsidiary of the corporation that acquired all of Mil-Tech's stock for nominal consideration and because Mil-Tech's assets, ostensibly bearing some relationship to the value of its stock, were insubstantial.

sign and manufacturing establishment," were signed on June 28, eight days after bid opening. The Commonwealth of Virginia issued Mil-Tech's Certificate of Incorporation on July 13, 1983, and Mil-Tech's first meeting of the three directors and shareholders was held on August 31, 1983, when Oliver W. Brown ("Oliver Brown"), sole shareholder of Mil-Tech, was elected president. The August 31, 1983 minutes also reveal that Oliver Brown contributed $5,000 to Mil-Tech for his 500 shares.

Mil-Tech was a *de facto* corporation under the laws of Virginia as of the date of bid opening, and defendant does not now contend otherwise. Oliver Brown had made every effort since the first week of June 1983 to incorporate Mil-Tech well in advance of June 20, 1983, and the failure to secure articles by June 20 was due to neglect, illness, and error of counsel not representing Mil-Tech in this court.

Telex initially protested award to anyone but itself on June 28, 1983, based upon Mil-Tech's alleged failure to price all items. The contracting officer denied Telex's protest on July 15, 1983, and determined Mil-Tech's bid to be responsive because of the pattern of bid prices established in its bid. Telex next protested the award to Mil-Tech on July 21, 1983, and August 2, 1983, on the ground that Mil-Tech was not a corporate entity in existence as of the date of bid opening, so that the signature of Oliver Brown as president of Mil-Tech failed to obligate an existing entity, thus rendering Mil-Tech's bid nonresponsive. Telex charged as a second ground that Mil-Tech failed to reveal its affiliates, because telephone calls placed to the number identified in Mil-Tech's bid were answered on behalf of other entities, the owner of one of which attended bid opening as a representative of Mil-Tech. The contracting officer determined Mil-Tech to be responsive based on its *de facto* existence; noted that the second ground raised a question of eligibility, not responsiveness; and denied Telex's second protest on August 16, 1983.

The pre-award survey conducted by the Defense Contract Administration Services Management Area, Philadelphia ("DCAS-MA"), resulted in a recommendation on August 8, 1983, against award because it appeared that Mil-Tech lacked technical, production, financial, and quality assurance capabilities, as well as plant facilities and equipment and labor resources, and because Mil-Tech was not a "regular manufacturer" under the Walsh-Healey Public Contracts Act, 41 U.S.C. § 35(a) (1982), 41 C.F.R. § 50–206.51 (1983) (the "Walsh-Healey Act").[2] Based on the pre-award survey, the contracting officer notified Mil-Tech on August 10, 1983, that it was considered ineligible under the Walsh-Healey Act. On August 16 the contracting officer found Mil-Tech nonresponsible based on the "negative Pre-Award Survey" and "all other relevant data." The matter was referred on August 16 to the Small Business Administration (the "SBA") for a certificate of competence ("COC") and a determination of eligibility under the Walsh-Healey Act.

On September 9, 1983, the SBA notified Oliver Brown that he was ineligible for COC consideration because Brown was on probation for the misdemeanor federal tax violation of failing to deposit withholding taxes.[3] On September 12, 1983, according

2. The text summarizes the recommendations of the DCASMA, although Mil-Tech asserts that the pre-award survey should have spoken only to Mil-Tech's ability to obtain resources for performance.

3. The SBA document states that "a piece of information that rendered Mr. Brown ineligible for COC consideration" was noted and that Oliver Brown was so advised on September 9. Mil-Tech does not dispute that Oliver Brown's probation was the referenced information. The probation terminated four months ago. However, the facts remain that Mil-Tech encoun-

tered difficulties in demonstrating the ability to perform, *see supra* note 2, and that Mil-Tech's resorting to ATACS Corp. ("ATACS") was an attempt to remedy not only Oliver Brown's eligibility for COC consideration, but Mil-Tech's performance capability. Whether or not the SBA could question Brown's standing, therefore, is immaterial, since valid questions were raised concerning the stock transfer. Further, assuming that ATACS came to own all of Mil-Tech's stock only because of questions relating to Oliver Brown's standing, a sale of Mil-Tech's assets to ATACS would have led to the same result

to a letter on that date from the SBA to the contracting officer, Oliver Brown advised the SBA that he "will transfer all stock" in Mil-Tech to his brother Charles L. Brown, Jr. The SBA's September 12 letter also requested a time extension to determine whether the transfer of stock affected Oliver Brown's "COC eligibility." Minutes of a joint meeting of shareholders and directors of Mil-Tech on September 9, 1983, state that on that date Charles Brown had announced his stock purchase. The minutes do not reveal what, if any, consideration Charles paid. Oliver Brown also resigned as Mil-Tech's president and director at this meeting. It is not clear whether the SBA declined to recognize the transfer to Charles.

At any rate, Mil-Tech then became a wholly-owned subsidiary of ATACS Corp. ("ATACS"), and Oliver Brown became a commissioned sales representative of ATACS. On September 18, 1983, the directors and shareholders of ATACS met to ratify ATACS' acquisition on September 16 from Charles Brown of 500 shares in Mil-Tech, which was all of Mil-Tech's outstanding stock, for $200 cash and $5,000 payable upon ratification by ATACS. The ATACS board also ratified an agreement to compensate Oliver Brown for his costs and efforts in submitting a bid on the subject procurement by payment of $24,800 upon the award of a contract by the Army to Mil-Tech and payment of a 50 percent sales commission on any savings in acquiring materials.

ATACS' board voted at the September 18 meeting to purchase a new issue of 9,500 shares of Mil-Tech stock in consideration for $50,000 plus the transfer of certain equipment to Mil-Tech valued by ATACS at $45,000. Upon Mil-Tech's securing a line of credit for contract performance, ATACS

committed itself to issuing an irrevocable performance guarantee not to exceed $600,000. Charles Brown's resignation from Mil-Tech was presented at the September 18 meeting, and three of ATACS' five-member board became the new directors of Mil-Tech. The new directors, who were also authorized to vote Mil-Tech's shares, resolved that Mil-Tech would lease floor space in the ATACS building and "certain test equipment and other machinery," from ATACS for a total of $60,000 per year.

On the same date, the new Mil-Tech shareholders and directors met to elect two of their number officers of Mil-Tech; to accept the resignation of both Browns and the other Mil-Tech directors; and to authorize the stock issuance, lease, and application for line of credit. Mil-Tech's new president was also empowered to give the Army appropriate assurances of Mil-Tech's commitment to honor its bid.

The minutes of the ATACS and Mil-Tech board meetings, as well as other documents relating to Mil-Tech's evolution into the corporate family of ATACS, were included in Mil-Tech's September 20, 1983 submission to the SBA. The record does not reveal whether this submission found its way to the contracting officer. In any event, the new president of Mil-Tech met with "representatives" of the Army on September 19 and advised the Army of ATACS' purchase of Mil-Tech's stock. The Army, in turn, advised that it would look into the acquisition because, in the words of Mil-Tech's president, it might "'violate the integrity of the procurement' process or be a legal impediment to contract award." Mil-Tech claims that after this meeting it was notified by the contracting officer that the Army considered Mil-Tech financially and technically responsible.

---

before the contracting officer and in this court. One final scenario—that ATACS would have supplied the requisite resources to Mil-Tech without a stock or asset purchase had Oliver Brown's standing not been questioned—is not borne out by the record. As of September 9, 1983, when the SBA advised Oliver Brown of his ineligibility for COC consideration, no indica-

tion is present that ATACS was in the picture; in fact, Oliver Brown had secured a contingent lease on September 1, 1983, with another lessor—not ATACS.

For the reasons argued by defendant in earlier briefs, this is not a case of constructive debarment.

Although the SBA drafted a telegram on September 22, 1983, to the effect that Mil-Tech, a wholly-owned subsidiary of ATACS, had the capacity and credit to complete the contract, defendant states that the message was cancelled. The draft memorialized a telephone conversation between the contracting officer and the SBA, wherein the SBA indicated that it was formally considering issuance of a COC on behalf of Mil-Tech. The SBA did advise the contracting officer on September 22: "In light of the stock transfers that have taken place and our prior discussions regarding the firm's eligibility for award ... the COC review and the case have been placed in suspense pending resolution of the question of eligibility for award." If the contracting officer were to determine that Mil-Tech was eligible, the SBA further stated, a new pre-award survey and a new responsibility determination would be necessary before a COC would be processed, unless the Army decided to make a direct award. The contracting officer withdrew the COC request on September 23 and wrote Mil-Tech on September 30, 1983, that the Army "may not" recognize the transfer of stock to ATACS for purposes of award: "Mil-Tech ... as presently constituted, has been determined ineligible to receive award ...."

In the meantime, on July 21, 1983, Telex had protested to the General Accounting Office (the "GAO") that Mil-Tech's bid should be rejected as nonresponsive. On October 3, 1983, Mil-Tech protested the contracting officer's determination of its ineligibility to the GAO. On January 30, 1984, the GAO issued its decision sustaining Mil-Tech's protest and denying Telex's protest. *Telex Communications, Inc.,* 84–1 C.P.D. ¶ 127 (1984). The GAO determined that the sale of stock to a non-bidding entity did not inhibit award to Mil-Tech because the bidding entity still existed and would perform the contract. Telex's arguments concerning post-bid incorporation and incomplete price submissions were denied, and the GAO dismissed Telex's contentions that Mil-Tech may have falsely certified that it did not have affiliates and that it did not pay a contingent fee to obtain the contract. Pertinent to the question of eligibility, the GAO noted that Mil-Tech had assets prior to the sale to ATACS consisting of an agreement to lease production facilities, arrangements for financing, letters of interest from potential employees, and a manufacturing plan.

On February 9, 1984, Telex requested reconsideration of the GAO's decision. The GAO denied that request on April 18. *Telex Communications, Inc.,* 84–1 C.P.D. ¶ 440 (1984) (denial of request for reconsideration). On February 28, 1984, having concluded that it satisfied all requirements for award, DCASMA recommended that Mil-Tech be awarded the subject contract. ATACS had issued to the Government on February 24, 1984, a full contract performance guarantee on Mil-Tech's behalf. A handwritten statement in the technical evaluation portion of the second pre-award survey reads: "[Mil-Tech] has the ability to meet contract requirements. It is essential that ATACS Corp. provide full support of its resources, as they agreed to do, as the parent company, to perform successfully as above." On April 25, 1984, an Army official informed Mil-Tech's counsel by telephone that the Army would make an award on April 30 and that counsel "would be happy with the result." This may indicate that the contracting officer had changed her decision, but definitely was the last signal given by the Army that it would bow to Mil-Tech's efforts to obtain contract award.

On May 3, 1984, Mil-Tech filed its action. On May 4, 1984, the Army sought reconsideration of the April 18, 1984, denial of Telex's request for reconsideration on the eligibility issue. Upon this court's call, as requested by defendant, the GAO reversed itself on re-reconsideration and found Mil-Tech ineligible primarily because the sale of Mil-Tech's stock to ATACS amounted to a prohibited sale of a bid to a nonbidding entity. *Mil-Tech Systems Inc.; The Department of the Army,* B–212385.4; B–

212385.5 (June 18, 1984) (denial of request for re-reconsideration).[4]

## DISCUSSION

■ The rejection of Mil-Tech's bid based on the determination of ineligibility should not be overturned unless no rational basis exists for the contracting officer's determination. *Essex Electro Engineers, Inc. v. United States*, 3 Cl.Ct. 277, 280 (1983); *Harris Data Communications, Inc. v. United States*, 2 Cl.Ct. 229, 237 (1983) (citing *M. Steinthal & Co. v. Seamans*, 455 F.2d 1289, 1301 (D.C.Cir.1971)), *aff'd*, 723 F.2d 69 (Fed.Cir.1983).

In this case the contracting officer determined that the transfer of stock from Mil-Tech to ATACS was not going to be recognized and that Mil-Tech "as presently constituted" was deemed ineligible for contract award. It was only in the course of Mil-Tech's protest before the GAO that the contracting officer elaborated upon the rationale for the ineligibility determination.

Sometime before the GAO's initial decision upholding Mil-Tech's protest on January 30, 1984, and after Mil-Tech filed its protest on October 3, 1983, the Contracting Officer's Statement was submitted to the GAO. The contracting officer pointed out that since the initial determination that Mil-Tech was a *de facto* corporation as of the date of bid opening, "It has ... become evident that Mil-Tech was not an operating corporation in any sense of the term nor did Mil-Tech possess any facilities or employees...." The contracting officer also made the following statements:

> Mil-Tech Systems, at the time of bid opening and at all times prior to the sale of stock to ATACS Corp., was no more than a shell corporation with no facilities, no ongoing contracts (no business transactions of any kind), and no employees; in short, with no tangible assets whatsoever. Mil-Tech had nothing of value to

sell except for this one bid and Mil-Tech as it is presently constituted bears absolutely no resemblance to the entity that submitted the bid except in name. Award of this contract to Mil-Tech would in reality constitute an award to ATACS Corp., a company which failed to submit a bid despite more than adequate notification of the instant procurement in the Commerce Business Daily. It is the opinion of the Contracting Officer that to permit a company to take over the bid of another after bid opening, and thereby become eligible for award, would seriously compromise the integrity of the competitive bidding system. Such action would allow and even encourage the submission of bids through irresponsible paper corporations, affording the real principles [sic] the opportunity to avoid or ratify these bids in there [sic] own best interest. To permit such action would further facilitate the submission of bids by a nonresponsible party who could then, if low bidder, sell the potential contract for a profit. Such flagrant manipulation of the system cannot be tolerated.

> \* \* \* \* \* \*

> ... The question of stock ownership is relevant from a contractual point of view when it involves, as this case does, the substitution of a nonbidding entity for one which submitted the bid. It is important to note that the Contracting Officer did not look beyond the corporation by choice, but rather by necessity. Because Mil-Tech failed to satisfy any requirements of the Pre-Award Survey, the case had to be referred to the SBA. The SBA has independently established its own criteria for determining which companies may be considered eligible for COC processing. Mr. Brown's probationary status rendered Mil-Tech ineligible to even be considered for a COC. Mr. Brown's

---

4. Mil-Tech also protested unsuccessfully the award to Telex of a sole-source contract for 30,000 antennas based on urgent need. That portion of Mil-Tech's claim has been dismissed.

Mil-Tech insists that the court should not be persuaded by the GAO's latest decision because of the Army's tardiness in seeking it. The GAO deemed both the Army's request and Mil-Tech's protest untimely, but issued its decisions because the court had issued a call.

subsequent attempts to make Mil-Tech eligible for COC consideration by two rapid stock transfers are considered by the Contracting Officer to be a complete sham, and further, such actions on Mr. Brown's part caused the question of stock ownership to remain a central and relevant issue.

The issue is not whether the contracting officer failed to disclose an adequate basis for her determination, although she did put Mil-Tech in the position of guessing at the particulars. (For example, in the October 3, 1983 protest, Mil-Tech defended the contingent fee arrangement with Oliver Brown, to which the contracting officer responded, "The question of a contingent fee paid to Mr. Brown is not considered by the Contracting Officer to be a relevant issue. Rather, the transactions outlined in Mil-Tech's discussion are considered by the undersigned to be an outright sale of bid.") The issue for decision turns on whether the ineligibility determination was authorized and, if so, rational.

### 1. *Transfer of Mil-Tech's Bid*

The predicate for the contracting officer's decision condemning the sale of Mil-Tech's stock to ATACS was that Mil-Tech's bid had been transferred, a finding contested by Mil-Tech.

Mil-Tech's sold its stock for $5,200 to ATACS (after the interim sale to Oliver Brown's brother). On the date ATACS bought Mil-Tech's stock, Mil-Tech's assets consisted of $5,000 cash; the lowest responsive and non-responsible (as of August 16, 1983) bid on a contract worth over $8 million; work product developed to perform the contract; and a lease and five employment agreements, all of which were contingent upon contract award.[5] The sale of all Mil-Tech's stock transferred to ATACS sole ownership of the bid. Assuming that Mil-Tech's assets—other than the bid—had any relationship to the value of its stock, the assets were of insubstantial value, *i.e.*, $5,200 paid for $5,000 cash and $200 in bid work product and contingent agreements. Even if the amount paid for the stock is not considered, Mil-Tech's stock represented ownership of precious little other than the bid. *See Keco Industries, Inc.*, 80-2 C.P.D. ¶ 165 (1982) (substitution of bidder upheld when substantial assets, including inventory, supplies, machinery, equipment, real estate, business records, and purchase and sales orders, transferred); *Information Services Industries*, 77-1 C.P.D. ¶ 425 (1977) (substitution of bidder disallowed when assets of negligible value transferred for nominal consideration); *Numax Electronics, Inc.*, 54 Comp. Gen. 580 (1975) (bid transfer incident to sale of an entire portion of business embraced by proposal can be permissible).

■ Mil-Tech rebounds with the argument that a sale of assets differs from a stock sale because divesting oneself of assets leaves a bidder without the means to perform. Although Mil-Tech remained Mil-Tech after acquisition by ATACS, the corporation became a wholly-owned subsidiary of its new parent; Mil-Tech thus sold ownership of itself and its assets to ATACS;

---

**5.** Considerable effort had been expended by Oliver Brown to acquire the physical and personnel resources to perform the contract upon award. As of the date ATACS bought Mil-Tech's stock, September 18, 1983, Oliver Brown had obtained a signed lease for premises dated September 1, 1983, contingent, however, upon contract award. Some five signed "Agreements of Employment Intent" (dated in July 1983) with key personnel were also contingent (and silent on renumeration). Moreover, Mil-Tech had, as of September 18, its own manufacturing plan, quality assurance manual, vendor quotations, engineering test plan, and material control sheets (detailing parts and machinery necessary to manufacture the antennas).

As of September 20, 1983, when the new Mil-Tech made its presentation to the SBA, ATACS had supplied a lease with ATACS and some of its personnel and did not include all of the foregoing bid work product in its listing of resources. Also infused into Mil-Tech by ATACS as of September 20 was $50,000 cash and $45,000 in equipment. This was not consideration for the sale, because Oliver Brown was no longer a stockholder of Mil-Tech. As a commissioned sales representative of the new Mil-Tech, Oliver Brown was to receive a substantial commission payable only upon award of the contract and a commission on cost savings for materials purchased for the contract.

and Mil-Tech the subsidiary retained the bid. A sale of stock divesting Mil-Tech of ownership of itself, as it were, cannot mask the real divestiture of assets. While its assets remained with the new Mil-Tech, ATACS owned Mil-Tech. The sale of stock in this case effected the transfer of Mil-Tech's bid.

### 2. *Authority for the Contracting Officer's Decision*

Neither anti-assignment act, 31 U.S.C. § 3727 (1982) (claims) (formerly § 203), 41 U.S.C. § 15 (1982) (contracts), prohibits transfer of a bid. No regulation applicable to this procurement prohibits a bid transfer. The General Services Administration (the "GSA"), in contrast, has issued a regulation restricting bid transfers based on transfers of assets:

> After submitting a bid, if a bidder transfers all of his assets or that part of his assets related to the bid during the period between the bid opening and the award, the transferee may not take over the bid. Accordingly, the contracting officer shall reject the bid (see Comptroller General decision B–171959, September 3, 1971) [*I.D. Precision Components Corp.*, 51 Comp.Gen. 145 (1971)].

41 C.F.R. § 1–2.404–2(h) (1983). Army procurements after April 1, 1984, will be restricted by a similar regulation, which provides:

> After submitting a bid, if all of a bidder's assets or that part related to the bid are transferred during the period between the bid opening and the award, the transferee may not be able to take over the bid. Accordingly, the contracting officer shall reject the bid unless the transfer is effected by merger, operation of law, or other means not barred by 41 U.S.C. 15 or 31 U.S.C. 203.

FAR § 14.404–2(k), 48 Fed.Reg. 42,180 (1983). Although these regulations do not affect this procurement, they reveal that regulations can be promulgated to reach the same result as did the contracting officer in this case.

It is Mil-Tech's contention that without an authorizing statute or regulation, the contracting officer was powerless to ground ineligibility on ATACS's absorption of Mil-Tech as a wholly-owned subsidiary. Defendant responds that the authority for the contracting officer's decision cannot be so neatly circumscribed. According to defendant, the "significant policies behind the restrictions on transferring bids," "which go to the heart of the competitive bidding process," themselves authorize an ineligibility determination based on the transfer of a bid in the circumstances of this case.

■ A principal objective served by the procurement process is the public's interest in conserving government funds. "Since the funds which the Government utilizes to purchase goods and services are derived solely from public sources, the public has strong interest in the ability of the Government to fulfill its requirements in these areas at the lowest possible cost...." H.R.Rep. No. 312, 97th Cong., 1st Sess. 43 (1981) (accompanying the Federal Courts Improvement Act of 1982, 28 U.S.C. § 1491(a)(3) (1982)); *see Flight International Group, Inc. v. Federal Reserve Bank,* 583 F.Supp. 674, 683 (N.D.Ga.1984); *CCTW & M v. EPA,* 452 F.Supp. 69, 75, 79 (D.N.J.1978). *See generally United States v. John C. Grimberg Co.,* 702 F.2d 1362, 1371 (1983) (en banc). Moreover, the subject procurement was undertaken under the section 8(a) program, 15 U.S.C. § 637 (1982), so that due regard should be given to the program policies of developing business ownerships by socially and economically disadvantaged individuals, assisting such businesses to compete, and expanding the program for government procurement from these businesses. 15 U.S.C. § 631(e)(2).

Here, the lowest responsive and (after the second pre-award survey) responsible bid comes under scrutiny and should not be displaced unless prohibiting an award to any bidder other than Mil-Tech would undermine the integrity of the procurement process. The oft-canted phrase "preserving the integrity of the procurement process"

has been described as the Government's adherence to its duty of following its own statutes and regulations. *See, e.g., M. Steinthal & Co. v. Seamans,* 455 F.2d at 1305; *Scanwell Laboratories v. Shaffer,* 424 F.2d 859, 864 (D.C.Cir.1970); *International Association of Firefighters, Local F-100 v. Department of the Navy,* 536 F.Supp. 1254, 1259 (D.R.I.1982). This would seem to support Mil-Tech's argument that absent a statute or regulation prohibiting bid transfers, the contracting officer could not declare Mil-Tech ineligible.

Defendant contends that substitution of a non-bidding party frustrates the procurement policy of requiring responsible parties to stand behind their bids. A bidder without means for performing a contract, short of transferring the bid to another entity, has the option of avoiding the consequences of its bid with impunity simply by being declared nonresponsible. According to defendant, a bidder who is in a position to avoid a contract by allowing the procuring agency to disqualify the bid for nonresponsibility (when the bidder well knew it was nonresponsible when it bid) could cause unnecessary costs and delays attendant on reprocurement if the other bids have expired. This policy, however estimable in the abstract, is not compelling in this case, because the bidder, who at bid opening lacks the ability to perform and who fails in an attempt to qualify himself, also can walk away from the award. Every indication is present that Mil-Tech, under Oliver Brown's stewardship, intended to stand behind its bid and to demonstrate the requisite ability to perform. Furthermore, the GAO does not penalize small businesses which enter into post-bid-opening agreements, including sales of substantial assets, to obtain performance resources. *See Telex Communications, Inc.,* 82–1 C.P.D. ¶ 127, at 3–4 (citing cases).

▮ The GAO decisions, however, do not permit a bidder to fortify its performance resources by sale of its bid unless accompanied by substantial assets to the end that not only a bid is being sold. *Keco Industries, Inc.,* 80–2 C.P.D. ¶ 165; *Information*

*Service Industries,* 77–1 C.P.D. ¶ 425; *Numax Electronics, Inc.,* 54 Comp.Gen. 580. In *I.D. Precision Components Corp.,* 51 Comp.Gen. 145 (1971), the GAO held more strictly that bid transfers are to be avoided unless effected by operation of law to a legal entity which is the complete successor in interest to the successful (or original) bidder. *Accord* 43 Comp.Gen. 353, 372 (1963). The underlying policy for the decision in *I.D. Precision Components Corp.* was fairness to all bidders: "To permit a party to enter into the competition after bids have been opened by virtue of taking over the bid of one whose situation makes its responsibility questionable would seem to provide an unwarrented [sic] option to the prejudice of other bidders...." 54 Comp.Gen. at 148. Indeed, the integrity of the bidding process should be preserved so that no bidder obtains an unfair advantage over another. *See, e.g., Charles N. White Construction Co. v. Department of Labor,* 476 F.Supp. 862, 866 (N.D.Miss.1979); *International Engineering Co. v. Richardson,* 367 F.Supp. 640, 651 (D.D.C.1973).

This fairness policy demands that a bright line be drawn at the sale of a bid, whether the transaction transferring the bid takes the form of a sale of assets or stock. Permitting Mil-Tech to transfer its bid countenances bid brokering—the sale of a bid for a commission payable upon contract award. This was one aspect of unfairness identified by the contracting officer in her statement submitted to the GAO. If sale of a bid were allowed, a government contractor would no longer risk estimating the profit margin that could secure the low bid. The bidder could await his broker, who would present him with a *fait accompli* —the low responsive bid. The contractor need only determine whether the profit is acceptable given the commission asked and costs of performance. Nothing would have stopped Mil-Tech, for example, from "shopping" the other eight higher bidders to see if any would take over Mil-Tech's bid at the lower margin Mil-Tech allowed itself, plus Oliver Brown's commissions. Such a process is unfair to bidders who stand behind their bids with-

out knowing the amount of the bid against which they are bidding.

■ A bidder who secures a bid and then sells the bid and the assets relating to the bid of negligible or insubstantial value for nominal consideration, plus a commission for obtaining award of the contract, or who sells all the bidder's stock for nominal value under the same circumstances has an unfair advantage over bidders who calculate their bids taking into account their costs of performance or the costs of acquiring performance resources from others. This process encourages bid brokering by any other name.

■ The question becomes whether a procurement policy—in this case, the fairness policy—provides legal justification for a regulation or whether a regulation provides legal justification for a procurement policy. For example, the GSA in 41 C.F.R. § 1-2.404-2(h), quoted *supra* p. 33, cited to *I.D. Precision Components Corp.* to support its regulation prohibiting bid transfers accomplished by sale of assets. According to Mil-Tech's logic, the GSA's citation to a Comptroller General decision as authority for its regulation was surplusage. This logic is rejected. The contracting officer's decision in this case did not cite, but was consistent with, decisions of the GAO disallowing the transfer of a bid in conjunction with the sale to a nonbidding entity of assets of negligible or insubstantial value for nominal consideration. The rationality of a decision on bidder eligibility, or any other matter entrusted to the contracting officer's discretion, can be measured against analogous principles that the

Comptroller General has developed in the absence of statute or regulation. As long as the decision is rational in that it reflects evenhanded application of a valid procurement policy and does not violate a statute or regulation, it will be upheld by the court.[6]

■ That the sale of Mil-Tech was effected by a stock transfer does not distinguish the facts of this case from the reasoning employed by the GAO decisions. Mil-Tech may be a valid corporate entity standing ready to perform this contract at the lowest price offered. However, an award to Mil-Tech would subvert the integrity of the procurement process, because the record demonstrates that ATACS, in buying Mil-Tech's stock for $5,200, valued that stock based on assets consisting of $5,000 cash, Mil-Tech's bid, related work product, and contingent lease and employment agreements. Other bidders with assets of low value did not have the option of pricing the bid low, then securing a buyer who would take over the bid and furnish the wherewithal and ability to perform. A rational basis thus existed for the contracting officer's decision finding Mil-Tech ineligible. *See Information Service Industries,* 77-1 C.P.D. ¶ 425.

## CONCLUSION

Based on the foregoing, defendant's motion for summary judgment is granted, and plaintiff's motions for summary judgment and preliminary injunctive relief are denied.[7] The Clerk of the Court will dismiss the complaint.

---

6. Mil-Tech points out that ASPR 26-402, 32 C.F.R. § 26-402 (1983), allowing the Government post-award to recognize a successor in interest to a government contract, speaks both to asset and stock purchase transfers, but the GSA and FAR regulations, quoted *supra* p. 33, only prohibit transfer of assets. The GSA and FAR regulations could speak to a sale of stock. The fact that they do not, however, does not render the contracting officer's decision in this case either unauthorized or irrational. The GSA and FAR regulations serve only to illustrate regulations consistent with the GAO's position in *I.D. Precision Instruments Corp.* prohibiting the transfer of a bid by the sale of assets.

7. The court finds (1) that plaintiff cannot succeed on the merits; (2) that denial of injunctive relief will irreparably harm plaintiff, because, absent an injunction, its damages would not include lost profits; (3) that the public interest would not be served by enjoining the contract award in that the integrity of the procurement process would be undermined; and (4) that the United States would suffer harm if injunctive relief were granted for the same reason that the public interest would be disserved and that, although intervenor Telex has not made any showing of harm, enjoining contract award

IT IS SO ORDERED.

Costs to the prevailing party pursuant to 28 U.S.C. § 2412(a) (1982); RUSCC 54(d).

would allow Mil-Tech to obtain an unfair advan-

tage over other bidders.