**DLM & A, INC., Plaintiff,**

v.

**The UNITED STATES, Defendant,**

and

**Roh, Inc., and Northrop Services, Inc., Intervenors.**

No. 406–84C.

United States Claims Court.

Sept. 21, 1984.

Jacob B. Pompan, Alexandria, Va., for plaintiff. Fred Israel, Israel & Raley, Chartered, Washington, D.C., of counsel.

Victor B. Maddox, Washington, D.C., with whom was Acting Asst. Atty. Gen. Richard K. Willard, Washington, D.C., for defendant. Marianne Filice, Dept. of the Navy, Naval Sea Systems Command, Washington, D.C., of counsel.

Barry L. Shillito, Washington, D.C., for intervenor ROH, Inc. Keith L. Davis, Trammell, Chase, Lambert & Martindale, Washington, D.C., of counsel.

Anthony L. Young, Washington, D.C., for intervenor Northrop Services, Inc.

## OPINION

NETTESHEIM, Judge.

Plaintiff DLM & A, Inc. ("DLM & A"), filed an amended complaint for temporary, preliminary and permanent injunctive and declaratory relief to prohibit the Department of the Navy by its Naval Sea Systems Command (the "Navy") from awarding a negotiated contract pursuant to request for proposal N00024–84–R–2146(Q) (the "RFP") to intervenor ROH, Inc. ("ROH"). An evidentiary hearing was conducted on DLM & A's motion for a preliminary injunction after its request for a temporary restraining order was mooted by defendant's agreement to defer award. Defendant moved to dismiss the complaint for lack of subject matter jurisdiction to review a related determination of the Small Business Administration (the "SBA") on DLM & A's size protest and for summary judgment on the merits of the amended complaint. ROH opposed the granting of a preliminary injunction, and DLM & A filed an opposition to the motion to dismiss.

## FACTS

The subject $3.3 million cost-plus-fixed-fee ("CPFF") contract implements the Navy's Project Management and Program Planning Support Services for the Service Life Extension Program Aircraft Carrier Ship Acquisition Project (the "CV-SLEP program"). This program has been in effect for at least seven years, throughout which intervenor Northrop Services, Inc. ("Northrop") served as the prime contractor or subcontractor. During 1978–81, Northrop held the contract on the basis of a sole-source acquisition. Thereafter, Northrop was the subcontractor to DLM & A, the incumbent contractor for the CV-SLEP program. The genesis of this litigation was the Navy's proposed award of the next three-year contract to ROH, which responded to the RFP identifying Northrop as its subcontractor. Thus, Northrop's involvement in the contract spans a seven-year period, for three years of which Northrop acted as DLM & A's subcontractor, and Northrop would now act, upon contract award, as ROH's subcontractor.

Northrop's position as subcontractor evolved from the determination that the procurement to implement the CV-SLEP program should proceed as a total small-business set-aside. The RFP stipulated that a qualifying bidder must not have average annual receipts in excess of $13.5 million. DLM & A charges that, for purposes of this procurement, ROH and Northrop are affiliated as a joint venture, within the meaning of 13 C.F.R. § 121.-3(a)(vii)(C) (1984) ("an ostensible subcontractor which is to perform primary or vital requirements of a contract may have a controlling role such to be considered a joint venturer affiliated on the contract with a prime contractor...."), and that the "joint venture" comprised of ROH and Northrop exceeds the size standard established for this procurement. In addition, DLM & A alleges that ROH is an "affiliate" of Northrop under 13 C.F.R. § 121.3-2(a)(1) ("one concern controls or has the power to control the other ...."), and also fails to qualify as a small business concern on that ground.

On July 23, 1984, DLM & A protested the size status of ROH, which protest was denied pursuant to a size determination issued by the Regional Administrator of the SBA Region IX on August 15, 1984. DLM & A lodged its appeal with the SBA's Office of Hearings and Appeals on August 24, 1984, and the parties' submissions on appeal have been submitted to this court. The SBA's final decision in ROH's favor was issued on September 18, 1984.

The question whether this court has jurisdiction to review size determinations of the SBA and the propriety *vel non* of the SBA's decision will be addressed in any merits decision. The preliminary injunction proceedings focused, rather, on DLM & A's challenge based on cost realism factors to the contracting officer's determination that ROH should receive the contract award based on cost (estimated cost plus fees).

The evaluation factors for award of the contract include major program management experience, technical approach, management plan, facilities, and cost. Section 5.0 of the RFP provided:

> [C]ost is not expected to be the controlling factor in the selection of a Contractor for this solicitation. The degree of importance of cost as a factor could become greater depending upon the equality of the proposals for other factors evaluated; *where competing proposals are determined to be substantially equal, total cost and other cost factors would become the controlling factor.*

(Emphasis added.)

The Technical Evaluation Review Panel (the "technical review panel") assigned DLM & A a higher evaluation than ROH. DLM & A's total technical score was 623.6 points, compared with 592.9 points given to ROH—a difference of 30.7 points or 5.2 percent. DLM & A, however, bid at $3,825,829, and ROH offered $3,345,235—a difference of $480,594 or 14.4 percent. After the contract specialist, who was the contracting officer's designated representative, reviewed the cost proposals and found that cost factors indicated an award to

DLM & A, the Contract Award Review Panel (the "CARP") conducted its review and issued its recommendation accordingly. Noting the "fairly significant difference in estimated costs," the contracting officer consulted with the CARP chairman and contract specialist, as well as the program manager (the contracting officer's superior). The contracting officer then overruled the panel's recommendation and determined that the contract should be awarded to ROH based upon what he viewed as the substantial equality of the technical proposals and the significant cost savings to the Government.

## DISCUSSION

### Likelihood of Success on the Merits

■ In order to secure a preliminary injunction, DLM & A must show a strong likelihood that it will succeed on the merits. *Washington Metropolitan Area Transit Commission v. Holiday Tours, Inc.*, 559 F.2d 841, 843 (D.C.Cir.1977). Although decisions of this court, including this judge, have required that such a showing be made by "clear and convincing evidence,"[1] the Tenth Circuit's decision in *Goldammer v. Fay*, 326 F.2d 268, 270 (10th Cir.1964), the source of this standard, does not describe the evidence in such a fashion. Nor does any other court of appeals decision. In *Ideal Toy Corp. v. Plawner Toy Manufacturing Corp.*, 685 F.2d 78 (3d Cir.1982), plaintiff contended that the defendant, at the district court level, should have been required "to demonstrate likelihood of success on the merits by clear and convincing evidence." *Id.* at 81. The court, however, did not state what quantum of evidence should be required. Until the Federal Circuit characterizes the evidence required for showing a strong likelihood of success, this court declines to apply a more rigorous requirement than the District of Columbia Circuit, which provided the four-part test for injunctive relief thus far utilized by the Claims Court.

### Rationality of the Contracting Officer's Decision

■ The contracting officer's decision to award the contract to ROH shall stand unless no rational basis exists for the contracting officer's determination. *Mil-Tech Systems, Inc. v. United States*, 6 Cl.Ct. 26 at 31 (1984); *Essex Electro Engineers, Inc. v. United States*, 3 Cl.Ct. 277, 280 (1983); *Harris Data Communications, Inc. v. United States*, 2 Cl.Ct. 229, 237 (1983), aff'd, 723 F.2d 69 (Fed.Cir.1983) (citing *M. Steinthal & Co. v. Seamans*, 455 F.2d 1289, 1301 (D.C.Cir.1971)). Furthermore, the deference accorded the contracting officer's discretionary determination is particularly great when a proposed award based on a negotiated procurement is attacked. *DeMat Air, Inc. v. United States*, 2 Cl.Ct. 197, 202 (1983) (quoting *Keco Industries, Inc. v. Laird*, 318 F.Supp. 1361, 1364 (D.D.C.1970)); *Burroughs Corp. v. United States*, 223 Ct.Cl. 53, 65, 617 F.2d 590, 598 (1980).

### Determination of Substantial Equality

■ DLM & A challenges the contracting officer's overruling of the CARP's recommendation to award the contract to DLM & A. The RFP entrusts the contracting officer with such authority, if, in his judgment, the technical proposals are "substantially equal." When, after reviewing the CARP recommendation, the contracting officer inquired of the Chairman of the CARP whether either proposal was technically superior, the latter could neither offer

---

**1.** *See e.g., Isometrics, Inc. v. United States*, 5 Cl.Ct. 420 at 422 (1984) (order granting motion for preliminary injunction); *N.V. Philips Gloeilampenfabrieken v. United States*, 1 Cl.Ct. 783, 784 (1983) (order denying motion for preliminary injunction); *Baird Corp. v. United States*, 1 Cl.Ct. 662, 664 (1983).

   This judge required that entitlement to a preliminary injunction be shown by clear and convincing evidence in *Mil-Tech Systems, Inc. v. United States*, No. 221–84C (Cl.Ct. June 29, 1984) (order denying preliminary injunction and dismissing one claim for lack of subject matter jurisdiction). The result in *Mil-Tech Systems* could not be affected by the court's changed view, because jurisdiction for the claim was lacking under any formulation of the evidence required.

reasons to assist in debriefing ROH as to why DLM & A's proposal was technically superior nor explain the basis for the difference in the point spread between the technical proposals. The contracting officer consequently decided that the proposals were substantially equal based on the low percentage point spread (5.2 percent) between DLM & A's and ROH's scores. The Comptroller General has upheld findings of substantial equality in cases involving point spreads of over 15 percent. *See Grey Advertising, Inc.,* 76–1 C.P.D. ¶ 325, at 10–11 (discussing cases).

*RCA Service Co.,* 83–2 C.P.D. ¶ 221, relied on by DLM & A, recognized that "selection officials are not bound by recommendations made by a technical evaluation panel." *Id.* at 5 (citing *Bell Aerospace Co.,* 55 C.P.D. ¶ 244 (1975); 75–2 C.P.D. ¶ 168). Instead of reconvening a technical panel that had since disbanded, the contracting officer in *RCA Service Co.* reviewed the technical panel's scoresheets and narrative evaluations after he determined that the panel's evaluation summaries were deficient for failing to explain why the successful bidder's best and final technical score was lower than its initial score. From *RCA Service Co.,* DLM & A's expert, Dr. Paul L. Foster, a procurement expert and former senior Navy procurement executive, gleaned that the contracting officer in this case should have sought the advice of the technical review panel as to whether the proposals were technically equal. *RCA Service Co.,* however, did not prescribe any method for the contracting officer to use in determining the "significance of the difference" in technical scores. *RCA Service Co., id.*

The source selection plan in this case directed the contracting officer to resolve with the program manager areas of disagreement concerning the CARP's recommendation. Even if the contracting officer could have reconvened the technical review panel, his approach of discussing the matter with the CARP chairman and the program manager was consistent with the source selection plan and provided a basis for determining "what a difference in evaluation point scores might mean in terms of performance and what it would cost the Government to take advantage of it," *id.* (citing *Grey Advertising, Inc.* ), and therefore was not irrational.

*The Determination of Cost Realism and Reasonableness*

The contracting officer's assessment of cost realism and reasonableness[2] had to comport with DAR 32 C.F.R. § 3–807.1(d) (1983), which provides in pertinent part:

> *Requirement for Price or Cost Analysis.* Some form of price or cost analysis is required in connection with every negotiated procurement action. The method and degree of analysis, however, is dependent on the facts surrounding the particular procurement and pricing situation. Cost analysis shall be performed when cost or pricing data are required to be submitted. The extent of cost analysis should be that necessary to assure reasonableness of the pricing result, taking into consideration the amount and complexity of the proposed contract....

DLM & A faults the analysis undertaken by the contracting officer and his designate for failing (1) to have the Defense Contract Audit Agency (the "DCAA") audit all the proposals and (2) to measure cost realism by correlating the personnel proposed in ROH's technical proposal to the hours costed for the same personnel in ROH's cost proposal.

With respect to audits, 32 C.F.R. § 3–801.5(b)(1) provides in part:

> Field Pricing Reports on Contract Price Proposals.
>
> (1) Prior to negotiation of a contract or modification resulting from a proposal in excess of $500,000, when the price is based on cost or pricing data (3–807.3) submitted by the contractor, the contracting officer (PCO or ACO) or authorized representative shall request a field pricing report (which usually includes an audit review by the contract audit activi-

---

**2.** Only the determination of cost realism is at issue here.

ty), unless information available to the contracting officer is considered adequate to determine the reasonableness of the proposed cost or price. Whenever available data is considered adequate for a reasonableness determination, the contracting officer shall document the contract file to reflect the basis of the determination. Information of the type described in (i) through (vi) below ... should be useful in determining the extent of any field pricing support that is needed.

\* \* \* \* \* \*

(ii) Audited cost information from contract awards in process, or recently negotiated contracts.

The contracting officer, through the contract specialist, verified the rates of the bidders and their subcontractors through the DCAA, obtaining quotations of actual costs incurred by ROH under a similar contract. DLM & A's expert, Dr. Foster, found this analysis inadequate under *Kirschner Associates, Inc.*, 81–2 C.P.D. ¶ 178, which sustained a protest to a cost analysis wherein the contracting officer merely ascertained that the amount of the cost to the Government was lower and that the successful bidder was performing under a similar contract without cost overruns.

In this case the contract specialist considered the data supplied by the DCAA on ROH's actual labor rates under a similar contract to be adequate for a cost realism determination. He documented the basis of his determination with a table comparing the proposed and actual rates, explaining in his report that the procedure he followed of using a rate check instead of an audit "is customary when recent audit information exists." The contracting officer, William T. Chisholm, testified that the program could afford neither the time nor the expenditure necessary for a full audit in every case. Under these circumstances the decision not to undertake a full audit was rational.

The court's desire to have the benefit of advocacy by counsel on the issue of cost realism was in conflict with the need to preserve the confidentiality of the intervenors' costing data. To solve this problem, raised by Northrop's motion for a protective order, DLM & A, at the court's suggestion and with the intervenors' approval, retained an accounting expert to conduct an independent review of the cost proposals and other submissions and produce a neutral appraisal of the cost realism of the proposals. *See Triangle Manufacturing Co. v. Paramount Bag Manufacturing Co.*, 35 F.R.D. 540, 543 (E.D.N.Y.1964). The court received the same submissions under seal and of necessity refers to some of the data in this opinion.

The appraiser, Frederick Neuman, former Director of the DCAA, recommended an upward adjustment of the ROH contract price, refining his estimate of the adjustment at the hearing to $880,661, including fees. Mr. Neuman partially based his adjustment on a discrepancy between the relatively small number of hours costed for Northrop's four key personnel[3] in the cost proposal and the amount of work that the technical proposal apparently called for them to perform (3.3 manyears per year). In arriving at his conclusion that a discrepancy existed between manyears proposed to be worked by Northrop's key personnel and hours costed for them, Mr. Neuman relied for the former on a table in the technical proposal displaying a "Key Personnel Matrix," which presented percentage figures opposite each employee's name in a column marked "% OF TIME SUPPORTING CONTRACT." Counsel for defendant and both intervenors have taken the position that this phrase referred to the amount of time that each individual was available to work on the contract, not the amount of time that each actually would work.

The contract specialist, Lt. James P. Naber, who performed the cost realism analy-

3. Mr. Neuman's computation of the needed adjustment reflected the incongruence only for key personnel.

sis of the proposals, testified that he so understood the phrase, pointing out that a second table[4] in the technical proposal shows the exact same percentage figure opposite each employee's name, in a column marked "% AVAILABILITY." The contracting officer, Mr. Chisholm, agreed and further testified that in its technical proposal an offeror emphasizes its strength in personnel, whereas a cost proposal is intended to offer prices consistent with what the offeror considers necessary to accomplish the work. Although Marshall L. Hendrickson, the contracting officer's technical representative and a member of the technical review panel, testified that he regarded time spent "supporting the contract" as equivalent to actual work and would expect the individuals listed to spend approximately the time shown working on the contract, he expressed misgivings about this interpretation in view of the excessive number of manyears apparently indicated.[5] His "proposal synopses" submitted to the contracting officer note the vagueness of both proposals on the time to be spent on the contract by each employee. The court concludes that the table shows the availability (perhaps on a priority basis) of the listed personnel and that only the cost proposal purports to estimate the number of hours that will actually be worked by each labor category.

More important is the fact that the contract is to be performed under a work tasking arrangement, whereby, according to Mr. Hendrickson's testimony, each element of contract performance is to be separately developed in detail and separately authorized by the contracting officer. When necessary, the particular personnel to be used and cost are negotiated with the contractor close to the time that a particular work assignment is generated. Specific work tasking authorizations ("WTA's") are then signed by the contracting officer against the contract, which, given the nature of the system, outlines a greater range of activity than will actually take place.

The RFP itself qualifies its estimate of the effort required (22 manyears) with the words, "While this estimate may change in the proposed contract, all Offeror's [sic] proposals will be evaluated based on the Government's estimate." Thus, although Mr. Hendrickson's synopses of both intervenors' proposals contain the observation that they are vague on the amount of each individual's time to be spent on the contract, he testified that he would not expect this "fuzziness" ultimately to result in a cost overrun. Both Messrs. Hendrickson and Chisholm testified that overruns are very rare in contracts for this kind of work. Instead, according to the latter, the Government commonly receives money back at the end of performance. DLM & A's prediction that ROH personnel will perform more work than they have been costed for can be realized only if the contracting officer in fact requires more work than originally anticipated.

Although Dr. Foster testified that he would demand a much stricter correlation between the time for which each employee was made available and that for which he was costed, he agreed that a cost realism analysis is a matter for the contracting officer's good business judgment. Mr. Chisholm plausibly testified that if complete congruence were possible, a fixed price instead of a CPFF contract would have been used in order to pass the whole risk to the contractor.

Finally, the court observes an even greater discrepancy of the type DLM & A complains of between DLM & A's own technical proposal and the costing of its subcontractors' personnel. DLM & A's technical proposal contains a chart similar to ROH's, and states, in the resume of each employee, that the individual is "committed" to "participation" for the percentage

---

4. This table, entitled "Project Staff Personnel Assignments by Task," omits three individuals who are assigned to all tasks.

5. If all the percentage figures in DLM & A's chart are added, the sum of manyears made available is 41.05, compared to only 24.05 for ROH, on a 22-manyear-per-year contract.

of his time indicated. Although there is substantial congruence (by Lt. Naber's standards) between the percentage listed for each DLM & A employee and the number of hours for which he or she is costed, the same cannot be said of the subcontractor's employees. For example, 100 percent availability is indicated for each of ELS, Inc.'s six "senior logisticians", yet defendant's workpapers indicate that only 1,860 manhours of performance by "senior logisticians" of ELS have been costed.

DLM & A proffered a cost realism study showing a discrepancy of only 0.8 percent between its cost and technical proposals. The rationality of the contracting officer's decision does not depend on DLM & A's ability to conduct a cost realism study which will produce this result, however, but on whether the analysis actually performed by the contracting officer was rational. DLM & A has not shown that the contracting officer acted irrationally in awarding the contract to ROH based on cost despite the "incongruency" between the cost proposal and the table in the technical proposal. In ordering the contracting officer to conduct a supplemental cost realism analysis, the court did not require him to reconcile the two, although he was to pay some attention to the participation of high-priced personnel as reflected in the technical proposal in verifying the realism of ROH's labor rates. He concluded that "while absolute congruency cannot be determined in any proposal, there is not sufficient information to conclude that any of the proposed costs are so incongruent as to render them unrealistic."

In addition, Mr. Neuman believed that the total hours costed by Northrop fell short of "the total effort that [Northrop] was expected to perform." (By this, Mr. Neuman presumably meant nine manyears for each of the three years). He implied in his report that the manhours expected approximated 53,151. The total shortfall of hours in the cost proposal was estimated to produce an understatement of $495,285, including fees.

Mr. Neuman apparently based his assessment of an overall shortfall of hours for Northrop on the assumption that the ratio of manhours to manyears revealed in Northrop's cost proposal was too low. Mr. Chisholm, however, in answer to the question whether greater use of expert personnel could result in manhour savings for the contractor, testified that he regarded the number of hours in a manyear as a flexible matter which depended on the business judgment of the contractor. The ratio apparently used by Northrop was roughly the same as DLM & A's, anyway.

Thirdly, Mr. Neuman ascertained that some personnel named in ROH's technical proposal (which also covered Northrop) were currently salaried by ROH and Northrop at higher rates than the rates assigned in the cost proposals to the labor categories to which these individuals belonged. Proceeding on the assumption that ROH and Northrop would make maximum use of these top-salaried individuals to perform the work assigned to those categories, Mr. Neuman computed that the average rate charged for work performed by those categories would exceed the stated rates, producing a total overrun for the eight key ROH and Northrop personnel alone of $299,408, including fees.

The likelihood that the intervenors will manload their most costly personnel to the greatest possible extent is insufficient to warrant a finding that the contracting officer's failure to assume they would do so was irrational. On the contrary, according to Mr. Chisholm, the contracting officer would expect a contractor under a CPFF contract to use manloading flexibility in order to reduce costs and thereby realize a greater return on each cost dollar. Any desire by a contractor to benefit his key personnel would be balanced by the fear of jeopardizing the contractor's chances of receiving future contracts. DLM & A's present position illustrates this factor. Mr. Chisholm testified that his previous experience with what he considered DLM & A's high rates was prominent in his mind at the time he made his decision. Finally, the RFP itself allows for the use of labor cate-

gory rates or "composite rate[s] of those persons proposed" in costing labor.

Mr. Neuman further noted that ROH's cost proposal did not include the cost, estimated at $85,968, including fees, of assuming an existing maintenance agreement to service a Hewlett-Packard 3000 computer, "as contemplated by the RFP." In his supplemental cost realism determination submitted pursuant to the court's order entered after the evidentiary hearing was continued, the contracting officer states that the successful offeror will not be required to assume the Hewlett-Packard agreement after all. The cost of DLM & A's proposal, which includes the agreement, has been reduced accordingly in the cost realism determination.

DLM & A's final contention is that the contracting officer acted irrationally in accepting Northrop's quotation of rates substantially below those charged under the present contract. The average of the hourly rates proposed by Northrop under the instant solicitation is roughly 25 percent below its average hourly rate over the past year ($34.16).

Given Northrop's burden rates, however, a relatively small reduction in its employees' compensation suffices to produce a large reduction in overall, burdened rates. Moreover, the Navy did not have access to Northrop's invoices to DLM & A, which revealed Northrop's rates over the past year. As Mr. Chisholm testified, "[W]e don't award subcontracts." Instead, he relied on the prime contractors for the pricing of subcontractors. The section of the RFP setting forth the "Evaluation Factors for Award," requires the prime contractor to "[p]rovide a plan that establishes clear and direct accountability for the cost ... of the [subcontractor's] work."

The contracting officer's supplemental cost realism analysis of the ROH proposal included computations for a worst case scenario which envisaged Northrop charging the same rates to ROH that it has over the last year. These computations produced overall costs, including fees, for ROH of $1,185,003.11 for year one—compared to $1,199,941.88, excluding the computer costs, for DLM & A. The contracting officer determined, moreover, that the level of reduction in Northrop's average direct labor rate required to produce the roughly 25 percent reduction in overall rates "reflects an acceptable business judgment by ... [Northrop] with no quantifiable basis for rejection," and was partially explainable by allowances for "efficiencies and improvements." A comparison of the proposed average direct labor rates of DLM & A and ROH and of their subcontractors would not have alerted the contracting officer to the existence of a cost realism problem. Instead, the overall difference in the two cost proposals is primarily attributable to differences in the burden rates, as Lt. Naber noted in his original cost realism report.

The supplemental cost realism and reasonableness analysis fully satisfies 32 C.F.R. § 3–807.1(d). DLM & A has failed to show a strong likelihood that it will succeed on its claim that the contracting officer's decision was irrational.

*Appropriateness of Injunctive Relief*

In addition to showing a strong likelihood of success on the merits, three other findings must be made to entitle DLM & A to injunctive relief: that DLM & A will be irreparably damaged absent injunctive relief; that an injunction preventing the award to ROH does not substantially harm other parties; and that the public interest will be served by enjoining the award to ROH. *Washington Metropolitan Area Transit Commission v. Holiday Tours, Inc.,* 559 F.2d at 843.

Irreparable damage will be suffered by DLM & A without the injunction it seeks, because an action at law could only recoup DLM & A's bid preparation costs, but not loss of anticipated profits. *See Essex Electro Engineers, Inc.,* 3 Cl.Ct. at 287 (citing cases). Preliminarily enjoining the Navy from awarding the contract to ROH, however, would harm substantially ROH, because ROH is the low bidder and DLM & A has not shown any reason why ROH should be deprived of securing the benefits of

contract performance pending final decision by this court.

28 U.S.C. § 1491(a)(3) counsels that "[i]n exercising ... [its injunctive] jurisdiction, the court shall give due regard to the interests of national defense and national security." Defendant's witness, Commander Philip A. Helgerson, the Navy's Business and Financial Manager of the Aircraft Carrier Acquisition Program, testified that enjoining award of the contract, which is due to expire on September 28, 1984, would interrupt continuity of a contract for refurbishment of air carriers. It is difficult to find a significant impact of the interruption, since the witness claimed that interruption would only cause less timely and effective implementation of the program and restrict the Navy's ability to perform the job in the long run. The public interest in the integrity of the procurement process nonetheless has been served by denying a preliminary injunction, because the contracting officer's decision based on the cost considerations that favor ROH's obtaining the contract is rational.

## CONCLUSION

Based on the foregoing, an order entered on September 19, 1984, denying DLM & A's motion for a preliminary injunction.

IT IS FURTHER ORDERED, as follows:

Counsel for the parties shall advise the court's law clerk by September 28, 1984, whether they will proceed by summary judgment, and a proposed schedule therefor, or by trial on the merits, and a proposed date for its commencement.