LOGICON, INC., Plaintiff,

v.

The UNITED STATES, Defendant,

and

Analysis & Technology, Inc., Intervenor.

No. 91–921C.

United States Claims Court.

March 25, 1991.

Michael A. Gordon, Rockville, Md., for plaintiff. Donald C. Holmes, Holmes, Schwartz, & Gordon and D. Michael Bennett, Logicon, Inc., of counsel.

Kathryn A. Bleecker, Washington, D.C., with whom was Asst. Atty. Gen. Stuart M. Gerson, for defendant. Jonathan H. Kosarin, Associate Counsel, Naval Supply System Command, and Candice Fox–Wilson, Naval Underwater Systems Center, Dept. of Navy, of counsel.

John S. Pachter, Vienna, Va., for intervenor-defendant. Jonathan D. Shaffer, Smith, Pachter, McWhorter & D'Ambrosio, of counsel.

## OPINION [1]

NETTESHEIM, Judge.

Pursuant to 28 U.S.C. § 1491(a)(3) (1988), this pre-award bid protest is before the

---

1. This opinion is the redacted version of the full opinion of this court. The full opinion was

court after argument on intervenor's motion to dismiss; defendant's motion to dismiss or, in the alternative, for summary judgment; and plaintiff's cross-motion for summary judgment. Two overriding issues are presented for consideration. The first is whether the offerors' final proposals were sufficiently inadequate so as to provide the Government with a rational basis for reopening negotiations after deciding initially to award the contract to plaintiff and after disclosing plaintiff's proposed cost. The second issue is whether the Government violated any procurement regulations by reopening negotiations after disclosure of plaintiff's proposed cost, assuming that the Government's actions are characterized properly as initiating discussions as opposed to seeking clarification.

## FACTS

The following facts are undisputed, unless otherwise noted. The Department of the Navy's Naval Underwater Systems Center ("NUSC"), New London, Connecticut, acting as a procuring agency, issued Request for Proposals No. N66604–90–R–0549 (the "RFP"), which contemplated a Cost–Plus–Fixed–Fee Indefinite Delivery–Indefinite Quantity contract to provide technical support services. Logicon, Inc. ("plaintiff"), submitted its proposal on November 21, 1990. Intervenor Analysis & Technology, Inc. ("A & T"), and Sonalysts, Inc.,[2] also submitted proposals.

Under the contract the successful offeror would supply labor for NUSC's Submarine Electromagnetic Systems Department to aid NUSC in performing its role as the Navy's Systems Engineering Agent for Submarine Electronic Warfare Support Measure Systems ("ESM"). Qualified personnel would perform analytical and engineering services and engineering data management services, as well as testing and evaluation support. The RFP estimated that 140,000 manhours of labor would be necessary. As the incumbent contrac-

tor, A & T has performed the same or similar services since December 13, 1989.

Paragraph L30 of the RFP required that all proposals be categorized into two separate parts: technical and cost/price. The technical portion consisted of the following evaluation factors, in descending order of importance: 1) technical approach; 2) personnel; 3) corporate experience; 4) management approach; and 5) facilities. Concerning cost/price the RFP explained in ¶ M32(b) that

> [a]lthough Cost is the less important elevation factor, it is important and should not be ignored. The degree of its importance will increase with the degree of equality of the proposals in relation to Technical Capability, or when it is so significantly high as to diminish the value of the technical superiority to the Government.

In ¶ M32(a) NUSC provided that it would award the contract to the "responsible offeror whose offer, conforming to the solicitation, is determined most advantageous to the Government, cost and other factors considered."

Paragraph H40(a) of the RFP, entitled "Key Personnel Requirements," provided: "Certain skilled experienced professional and/or technical personnel are essential for successful performance of the work required under this contract...." To the same effect, ¶ L31(b)(1) stated: *"IMPORTANT:* Offerors are reminded that *ALL* personnel proposed must, at a minimum, meet the educational and experience qualifications specified on the PQS [Personnel Qualification Sheet]...." (Emphasis in original.) In the "Source Selection Plan" utilized by NUSC's evaluators, ¶ A.1. of Part Five set the following guideline: "DEFICIENCY: An aspect of a proposal which fails to meet Government established minimum requirements as established in the solicitation. An offeror must affirmatively meet RFP minimum requirements; any ambiguous, or vague treatment of an RFP

---

filed on March 21, 1991, under seal pursuant to protective order; it was distributed only to the parties and was not published.

**2.** Sonalysts is not a party to this litigation.

minimum requirement shall be labelled a deficiency."

The RFP required offerors to document the education and experience qualifications of these "key personnel" by submission of Personnel Data Forms ("PDFs") in accordance with the requirements listed in the PQSs. "Key personnel" included "systems engineers," "engineer/operations analysts," and "analysts."

The PQSs, as finally drafted by NUSC, stipulated that "systems engineers" were to have a Bachelor of Science degree in an engineering discipline, as well as "specialized experience in Submarine Electronic Warfare and in related Electronic Projects as in one or more of the following: Electronic Systems, Systems Design or Systems Acquisition." "Engineer/operations analysts" were to have at least three years "of specialized experience in Electronic Warfare" and a "Bachelor's Degree in Engineering, Mathematics, Science, or related disciplines." "Analysts" needed one year "minimum specialized experience conducting analyses in Electronic Warfare" and either a Bachelor's Degree in the scientific field or equivalent experience of four years in EW. The RFP contained no definition of "related discipline," "Submarine Electronic Warfare," or "Electronic Warfare" (the latter two terms hereinafter referred to as "EW").

When the proposals were evaluated and scored for technical merit under the two-tiered RFP, the technical evaluators at NUSC had no access to the offerors' bid prices. The solicitation closed on January 17, 1990.

The RFP established a Technical Evaluation Panel ("TEP") that evaluated all submitted proposals, assisted in discussions with offerors, screened initial proposals, and evaluated any amendments to the technical proposals. Lawrence P. Comstock, Branch Head of NUSC's ESM Systems Branch, served as Chairman of NUSC's TEP on this procurement. His duties included "overall responsibility for ensuring that the Technical Evaluation Reports are accurate and fair evaluations of the proposals received, and ... [individual] responsi-

bil[ity] for all reports." The RFP contemplated that, within ten days after receipt of proposals, the TEP Chairman submit an initial evaluation memorandum that served to identify, at an early stage, those proposals evaluated as "clearly unacceptable." This memorandum was also to identify all offerors and summarize any defects.

In their individual worksheets, the four TEP members noted varying degrees of deficiencies in the EW and ESM experience of all offerors' proposed personnel. The members assigned ratings to the individuals from the following scale:

1. "H"—highly acceptable—technical proposal outstanding in essentially all respects (90–100 points)

2. "A"—acceptable—no deficiencies; offeror fully qualified to perform (70–89 points)

3. "S"—unacceptable, but capable to being made acceptable—technical deficiencies appear to be correctable through discussions and moderate program revisions (59–69 points)

4. "U"—unacceptable—fatal deficiencies (0–49 points)

[There follows a detailed account of the comments and ratings assigned by the four TEP evaluators to each offeror's proposed personnel. The summary addressed only those key personnel whose qualifications would become the subjects of dispute in this litigation. In sum, at least one evaluator found proposed personnel of each offeror deficient with regard either to experience or education.]

In his Initial Evaluation Memorandum of February 7, 1990, TEP Chairman Comstock reported:

1. A cursory evaluation has been made of the three proposals submitted in response to the subject solicitation. It appears that each of the offerors has adequately addressed the SOW and the required evaluation factors (technical approach, personnel, corporate experience, management approach and facilities). None of the proposals fall into the "clearly unacceptable" category.

Following the scoring by the TEP members, it was Mr. Comstock's task to complete a detailed Offeror Summary Worksheet and a Category Summary Worksheet for each offeror. [There follows a detailed review of Mr. Comstock's worksheets for each offeror. Concerning plaintiff, he stated that despite some weakness in meeting experience requirements, plaintiff's proposal was "acceptable." With regard to Sonalysts, he noted the same general deficiencies as with plaintiff and also found its proposal acceptable. In respect of A & T, Mr. Comstock noted that failure to certify certain personnel would not permit a rating of A & T's proposal. He also stated that A & T had weaknesses concerning experience requirements.]

[There follows a detailed discussion of Mr. Comstock's eventual determination that the proposals of all three offerors were acceptable. Sonalysts had the highest technical rating, followed by A & T, then plaintiff. Mr. Comstock reiterated his evaluation in a later memorandum.]

On July 18, 1990, NUSC initiated discussions with the three offerors, requesting their responses to certain deficiencies and ambiguities found in their proposals. However, NUSC did not alert the offerors to any "deficiencies" concerning specialized submarine EW or specialized EW experience.

By memorandum dated September 26, 1990, "after a few minor points were clarified by the contractors....", Mr. Comstock confirmed his conclusion that all three offerors rated acceptable and reiterated the June 5 scoring. [There follows Mr. Comstock's statement concerning the TEP's preference for award from a technical standpoint.] Plaintiff submitted its best and final offer ("BAFO") on November 21, 1990.

On December 14, 1990, NUSC verbally notified plaintiff that it would be awarded the contract, but that actual award would

be delayed for one week due to a temporary unavailability of funds.[3] On the same date, NUSC disclosed plaintiff's proposed cost to the two other bidders. To date, plaintiff has no knowledge of the amount of either A & T's or Sonalysts' proposed cost.

In a memorandum formalizing this decision, dated December 21, 1990, Mr. Comstock stated that "the evaluation team has determined that even though both Sonalysts ... and ... [A & T] were rated slightly higher technically than ... [plaintiff], the differences in technical ratings do not justify the significant cost differences."

Also on December 21, 1990, A & T filed a bid protest with the General Accounting Office (the "GAO"). In its protest A & T alleged that no rational basis existed for awarding the contract to plaintiff because, *inter alia,* plaintiff lacked the technical qualifications or understanding to perform the contract work; the Navy failed to conduct a proper cost realism analysis, due in part to the presence of large blocks of uncompensated overtime in plaintiff's bid; and plaintiff's low bid price demonstrated that plaintiff failed to comply with key personnel requirements of the RFP. NUSC informed plaintiff of the protest by a letter dated December 27, 1990.

On January 7, 1991, NUSC moved to dismiss the protest pending before the GAO. NUSC asserted that, among other arguments, A & T's allegation that plaintiff was incapable of performing the contract, at the low price proposed, was a responsibility determination beyond the scope of permissible GAO review. Additionally, NUSC argued that A & T's allegations also concerned contract administration, a matter also within the agency's discretion. NUSC further asserted that A & T failed to set forth a sufficiently detailed statement of its factual and legal grounds.

While the protest was ongoing, according to John Clarkin, Deputy Department Head

---

3. According to plaintiff, before plaintiff received notice of contract award, NUSC verified several factors including the capability of plaintiff's personnel and corporate resources, plaintiff's understanding of the work, the degree to which

plaintiff's costs reflected the required work, and the risk of prospective performance by plaintiff. Additionally, the Defense Contract Auditing Agency audited plaintiff.

of NUSC's Commercial Acquisition Department,[4] NUSC personnel reviewed the scoring sheets prepared by each member of the TEP and discovered that the evaluators had rated certain key personnel proposed by the three offerors as less than acceptable. Affidavit of John Clarkin, Mar. 14, 1991, ¶ 4. Nevertheless, NUSC stood by its decision to award to plaintiff. Mr. Comstock, in a memorandum dated January 18, 1991, stated that, after conducting a "[g]reatest [v]alue [a]nalysis," the evaluation team recommended that plaintiff "still be awarded this contract based on the integrated assessment of technical and cost factors."

In a letter dated January 25, 1991, NUSC informed A & T in effect that Contracting Officer Cannata changed his position on awarding the contract to plaintiff. NUSC advised that Mr. Cannata had determined to reopen negotiations and would do upon receipt of word that A & T's protest had been withdrawn. In a letter telecopied the same date, A & T requested that the GAO dismiss the protest without prejudice. On January 28, 1991, the GAO dismissed the protest on the basis that the contracting agency had provided "appropriate relief" and that the protest therefore posed only "academic questions."

[There follows a detailed account of how, in letters dated February 6, 1991, Contracting Officer Cannata inquired of all contractors regarding certain "informational deficiencies" in their proposals. These letters concerned the educational and experience qualifications of certain key personnel proposed by all offerors.]

[There follows a summary of plaintiff's, A & T's, and Sonalysts' responses to the February 6, 1991 letters.] On February 13, 1991, NUSC notified plaintiff that it still desired to request new BAFOs. Plaintiff filed suit seeking injunctive relief on February 15, 1991.

[There follows a detailed account of how Mr. Comstock, in an evaluation dated February 19, 1991, determined that some of plaintiff's and Sonalysts' proposed key personnel failed to meet the RFP's minimum personnel requirements. A & T, however, through substituting personnel, satisfied the minimum requirements of the RFP.]

[There follows a detailed account of how Mr. Clarkin determined that Mr. Comstock erred by concluding that all offerors were acceptable. Mr. Clarkin stated that, based upon re-review of the TEP's initial scoresheets, all offerors were deficient in that they proposed non-conforming key personnel.]

In its complaint plaintiff sought a temporary restraining order ("TRO"), a preliminary injunction, and a permanent injunction to enjoin NUSC from reopening discussions, requesting another round of BAFOs, and awarding the contract to any entity other than plaintiff. Because NUSC voluntarily declined to award the contract until after completion of litigation, plaintiff's requests for a TRO and preliminary injunction are moot. Hence, the court need resolve only the claim for a permanent injunction.

### DISCUSSION

Plaintiff's claim to relief is that NUSC is attempting to conduct a prohibited auction by reopening negotiations and requesting

---

4. Defendant submitted Mr. Clarkin's affidavit with its reply brief, and plaintiff was given an opportunity to respond. Mr. Clarkin is the direct supervisor of Contracting Officer Cannata and also has supervisory authority and oversight responsibility concerning Mr. Comstock. As a higher level of authority, "it is not improper for ... [Mr. Clarkin] to ultimately make source selection decisions for lower level procuring activities...." *Grey Advertising, Inc.,* 76–1 CPD ¶ 325, at 13. This oversight function provides an appropriate agency official "with the authority to review source selection decisions, reverse or vacate those decisions and make his own reasonable source selection decisions in accordance with RFP criteria...." *Oklahoma Aerotronics, Inc.,* 90–1 CPD ¶ 337, at 5 (on reconsideration) (citation and footnote omitted).

Mr. Clarkin's affidavit contains hearsay to the extent that it relates Mr. Comstock's explanation for his errors and is rejected on point insofar as defendant relies on the affidavit to support its motion for summary judgment. On the subjects addressed in the text, however, Mr. Clarkin is competent and authorized to speak as the NUSC decisionmaker.

another round of BAFOs. Now that A & T and Sonalysts know plaintiff's proposed cost, which plaintiff cannot reduce, plaintiff is a sitting duck. NUSC's actions contravene public policy, plaintiff argues, because plaintiff's submissions in response to the February 6, 1991 list of deficiencies satisfied NUSC's professed concerns with plaintiff's personnel. Accordingly, plaintiff characterizes the letters as clarifications, which would not lead to reopened negotiations, *i.e.*, not require a request for BAFOs. A & T interposed its motion to dismiss before defendant filed its motion and argues that jurisdiction is lacking because NUSC did not violate the letter of the auction regulation and that plaintiff's claim is not ripe because discussions are ongoing, *i.e.*, the February 6, 1991 letters constituted discussions and, therefore, BAFOs are required. Defendant moved to dismiss or for summary judgment on the ground that the decision to reopen discussions was within the contracting officer's discretion and that having done so by the February 6, 1991 letters, BAFOs are required.

### I. *Standards for injunctive relief*

Pursuant to 28 U.S.C. § 1491(a)(3), the Claims Court may grant injunctive relief in a pre-award bid protest case where the Government has breached its implied duty to consider a bid honestly and fairly. *New America Shipbuilders v. United States,* 871 F.2d 1077, 1079 (Fed.Cir.1989) (citing cases); *Prineville Sawmill Co. v. United States,* 859 F.2d 905, 909 (Fed.Cir.1988). However, " 'injunctive relief [is] awardable ... only in extremely limited circumstances.' " *CACI, Inc.—Federal v. United States,* 719 F.2d 1567, 1581 (Fed.Cir.1983) (quoting *United States v. John C. Grimberg,* 702 F.2d 1362, 1372 (Fed.Cir.1983)). A frustrated bidder may obtain injunctive relief if it establishes either that the agency's actions were without a rational or reasonable basis, or that a clear and prejudicial violation of an applicable procurement statute or regulation occurred. *Vanguard Security, Inc. v. United States,* 20 Cl.Ct. 90, 101 (1990) (citing *CACI Field Servs., Inc. v. United States,* 854 F.2d 464, 466 (Fed.Cir.1988) (per curiam), and *National Forge Co. v. United States,* 779 F.2d 665, 668 (Fed.Cir.1985)).

If the procurement is negotiated, judicial review is more deferential than in advertised procurements. As the Court of Claims explained:

> It is also of key significance that the procurement in this case was conducted in the context of *negotiation* rather than by *formally advertised bidding.* In formally advertised bidding the pertinent statutes and regulations are far more strict about the conduct of the procurement than in a negotiated one, consequently in negotiated procurement the contracting officer is entrusted with a relatively high degree of discretion....

*Burroughs Corp. v. United States,* 223 Ct.Cl. 53, 65, 617 F.2d 590, 597–98 (1980) (emphasis in original). " '[T]he degree of proof necessary to overturn procurement determinations is related to the amount of discretion vested in the administrative official whose actions are being challenged.' " *Action Mfg. Co. v. United States,* 10 Cl.Ct. 474, 478 (1986) (quoting *Hayes Int'l Corp. v. United States,* 7 Cl.Ct. 681, 685 (1985)). "Because of ... [this] breadth of discretion ... in negotiated procurement, the burden of showing this discretion was abused ... is certainly much heavier than it would be in a case of formal advertising." *Burroughs* 223 Ct.Cl. at 65, 617 F.2d at 598 (citation omitted); *Tackett & Schaffner, Inc. v. United States,* 224 Ct.Cl. 530, 536, 633 F.2d 940, 942 (1980). Therefore, when investigating a negotiated procurement, wide discretion is given to a contracting officer's evaluation of bids, application of procurement regulations, and determination of bidder responsibility. *See DLM & A, Inc. v. United States,* 6 Cl.Ct. 329, 331 (1984) (citing cases).

Plaintiff contends that the decision to reopen negotiations and request another round of BAFOs is irrational and has violated the regulations prohibiting auctions. Accordingly, the court must decide whether NUSC's decision to reopen negotiations and request new BAFOs, after disclosure of plaintiff's proposed cost, either lacked a

rational or reasonable basis or constituted a violation of a procurement regulation.

█ In this case defendant once again takes occasion to task a contractor with proving its case for injunctive relief by clear and convincing evidence. Defendant is correct that quite a few judges of the Claims Court have adopted this standard. However, the standard is bereft of any support in precedent or policy. *See Quality Transport Servs. v. United States*, 12 Cl.Ct. 276, 281–82 (1987); *DLM & A*, 6 Cl.Ct. at 331. No federal appellate or other federal trial court requires a government contractor to prove entitlement to pre- or post-award injunctive relief by clear and convincing evidence. Short of a permanent injunction, the accepted standard is proof of a strong likelihood of success on the merits. The standard for a permanent injunction is a preponderance of evidence that the challenged action is irrational or unreasonable or violates an applicable procurement regulation.

When jurisdiction was assigned to the Claims Court to hear pre-award injunction claims, Congress anticipated that the Claims Court and Federal Circuit would draw on the expertise of the United States Court of Appeals for the District of Columbia Circuit:

> By conferring jurisdiction upon the Claims Court to award injunctive relief in the pre-award stage of the procurement process, the Committee does not intend to alter the current state of the substantive law in this area. Specifically, the Scanwell doctrine as enunciated by the D.C. Circuit Court of Appeals in 1970 is left in tact [sic]. *See Scanwell Laboratories, Inc. v. Shaffer*, 424 F.2d 859 (D.C. Cir.1970).

S.Rep. No. 275, 97th Cong., 2d Sess. 23 (1981), *reprinted in* 1982 U.S.Code Cong. & Admin.News 11, 33; *see CACI Inc.— Federal*, 719 F.2d at 1573. The D.C. Circuit does not apply the rigorous clear and convincing standard. Moreover, it is anomalous, if not nonsensical, to require a contractor to prove by clear and convincing evidence entitlement to injunctive relief before a contract is awarded, but to relax the burden if it sued after contract award in the United States District Court for the District of Columbia or in another federal district court. Indeed, since the remedy for a post-award suit theoretically is more draconian, *i.e.*, forced termination of a contract under performance, a better case could be made for a more stringent burden of proof in district court.

Defendant argues that the standard of clear and convincing evidence serves to underscore the Claims Court's limited review. That is true, but Congress intended that the Claims Court review pre-award injunction suits, and defendant's desired standard erects a barrier above the considerable jurisprudence, discussed above, that protects the federal procurement process from untoward judicial interference. The Claims Court was charged with exercising its jurisdiction circumspectly, not inhospitably. Nonetheless, flushed with its success in trumpeting the clear and convincing evidence standard, defendant urges that this court follow and endorse language in an opinion by another Claims Court judge characterizing a contractor's burden of proof by clear and convincing evidence as "egregious." Many things that litigators must confront are egregious, but burdens of proof are not among them.

## II. *Applicable regulations*

█ Preliminarily, the court must determine the level of justification the defendant must put forward in order to substantiate its decision to reopen negotiations after disclosure of plaintiff's bid price. Plaintiff argues that a "compelling reason" must be shown and cites *P. Francini & Co., Inc. v. United States*, 2 Cl.Ct. 7, 10 (1983), and *Eagle Construction Corp. v. United States*, 4 Cl.Ct. 470, 478 (1984) as support. Both A & T and defendant disagree with plaintiff's proposed standard. They note that these cases concern a sealed-bid invitation and a formally advertised procurement, respectively. As such, regulations different from those applicable to this case governed their outcomes. The court concludes that these cases are not on point.

48 C.F.R. ("FAR") § 15.611(c) (1990), sets forth the minimal rationale that must support a decision to reopen negotiations after receipt of BAFOs:

> After receipt of best and final offers, the contracting officer should not reopen discussions unless it is *clearly* in the Government's interest to do so (*e.g.*, it is clear that information available at that time is inadequate to reasonably justify contractor selection and award based on the best and final offers received). If discussions are reopened, the contracting officer shall issue an additional request for best and final offers to all offerors still within the competitive range.

(Emphasis added.)

In further support of its argument for a "compelling reason" standard, plaintiff argues that the discretion accorded a contracting officer by FAR § 15.611(c) is not unfettered. Plaintiff asserts that "[w]hatever discretion may exist to reopen negotiations in some abstract context is severely circumscribed when, as here, a real auction is involved...." Plf's Br. filed Mar. 11, 1991, at 19. However, such a standard has no support in the regulations or case law. In order to substantiate Contracting Officer Cannata's decision to reopen negotiations, defendant must show that such action was clearly in the agency's interest. Once NUSC puts forward the contracting officer's rationale, it becomes incumbent on plaintiff to prove by a preponderance of evidence that the justification is irrational or unreasonable or otherwise fails to satisfy the regulation.[5]

The regulation addressing the validity of auctions, FAR § 15.610(e), provides, in pertinent part:

> The following conduct *may* constitute prohibited conduct....
>
> (2) Auction techniques, such as—
>
> (i) Indicating to an offeror a cost or price that it must meet to obtain further consideration;
>
> (ii) Advising an offeror of its price standing relative to another offeror ...; and
>
> (iii) Otherwise furnishing information about other offerors' prices.

(Emphasis added.) Since a contractor's proposed cost has been disclosed, the regulation prohibiting auctions is brought into issue. The court is required to determine whether plaintiff has proved that any violation of this regulation in letter or spirit is outweighed by the agency's interest in obtaining compliance with RFP requirements.

Several other procurement regulations are relevant to this proceeding. FAR § 15.601, entitled "definitions," states, in pertinent part:

> *Clarification,* as used in this subpart, means communication with an offeror for the sole purpose of eliminating minor irregularities, informalities, or apparent clerical mistakes in the proposal. It is achieved by explanation or substantiation, either in response to Government inquiry or as initiated by the offeror. Unlike discussions ..., clarification does not give the offeror an opportunity to revise or modify its proposal, except to the extent that correction of apparent clerical mistakes results in a revision.
>
> ....
>
> *Discussion,* as used in this subpart, means any oral or written communication between the Government and an offeror (other than communications conducted for the purpose of minor clarification), whether or not initiated by the Government, that (a) involves information essential for determining the acceptability of a proposal, or (b) provides an offeror an opportunity to revise or modify its proposal.[6]

---

**5.** This case presents the unusual circumstance whereby an applicable procurement regulation (FAR § 15.611(c)) would be violated only if the contracting officer's decision is irrational or lacks a reasonable basis. Typically, a contractor need only demonstrate either 1) that a contracting officer's actions were irrational or unreasonable or 2) that a regulation has been violated.

**6.** The difference between clarifications and discussions was set out in *Microlog Corp.*, 90–1 CPD ¶ 227, at 4:

> Discussions occur when an offeror is given an opportunity to revise or modify its proposal, or when information requested from and provided by an offeror is essential for determining the acceptability of its proposal.... Dis-

FAR § 15.607, "Disclosure of mistakes before award," states in subsection (a):

> Contracting officers shall examine all proposals for minor informalities or irregularities and apparent clerical mistakes. (see 14.405 and 14.406).[7] Communication with offerors to resolve these matters is clarification, not discussion within the meaning of 15.610 However if the resulting communication prejudices the interest of other offerors, the contracting officer shall not make award without discussions with all offerors within the competitive range.

The regulation addressing the conduct of discussions, FAR § 15.610(c), provides, in pertinent part:

> The contracting officer shall—
>
> . . . .
>
> (3) Attempt to resolve any uncertainties concerning the technical proposal and other terms and conditions of the proposal;
>
> (4) Resolve any suspected mistakes by calling them to the offeror's attention as specifically as possible without disclosing information concerning other offeror's proposals or the evaluation process. . . .

FAR § 15.611(d) states:

> Following evaluation of the best and final offers, the contracting officer (or other designated source selection authority) shall select that source whose best and final offer is most advantageous to the Government, considering price and the other factors included in the solicitation. . . .

Given this regulatory framework, plaintiff's theory of relief can be detailed more specifically: NUSC decided initially to award the contract to plaintiff and then disclosed the amount of plaintiff's bid to the other two offerors. Subsequently, after A & T filed a protest with the GAO (at

first vigorously opposed by NUSC), NUSC changed its position and decided to reopen negotiations and receive new BAFOs. Plaintiff asserts that this change of position would constitute an improper "auction" in violation of FAR § 15.610(e), which prohibits "auction techniques." In plaintiff's view such an auction would prejudice its right to have its bid fairly and fully considered and would undermine the integrity of the procurement.

Plaintiff also claims that the "informational deficiencies" cited in the February 6, 1991 letter from NUSC did not represent deviations from the requirements of the RFP. Even if such deviations existed, they were at most minor and nonmaterial variances. As such, resolution of these deficiencies does not call for "discussions" under FAR § 15.601 and thus must be resolved by contract modification, not renegotiation.

According to plaintiff, public disclosure of its proposed cost would give the other two offerors an opportunity to lower their proposed cost to such an extent that either A & T or Sonalysts would receive award of the contract. As of yet, NUSC has not informed plaintiff of the bids of the other competitors. Plaintiff states that even if it possessed such knowledge, it would be to no avail. As averred in the affidavit of Vincent Wayne Steckler, the Department Manager of the Systems Engineering Department of plaintiff's Strategic and Information Systems Division, who serves as the manager responsible for submitting plaintiff's BAFO for this RFP, "if Logicon were to be requested to submit another best and final offer to NUSC, the total cost proposed by Logicon in its current best and final offer could not be lowered. Logicon bid the lowest realistic cost possible for Logicon to perform as required by the solicitation." Affidavit of Vincent Wayne

---

cussions are to be distinguished from a request for clarifications, which is merely an inquiry for the purpose of eliminating minor uncertainties or irregularities in a proposal. (Citations and footnote omitted.)

7. FAR 14.405 provides in part that "[a] minor informality or irregularity is one that is merely a matter of form and not of substance. It also pertains to some immaterial defect in a bid or variation of a bid from the exact requirements

Steckler, Feb. 28, 1991, ¶ 4.[8]

Finally, plaintiff contends that the decision to reopen negotiations lacks a rational basis.

### III. *Intervenor's motion to dismiss*

A & T moved to dismiss the complaint on three grounds: 1) lack of subject matter jurisdiction; 2) lack of ripeness for adjudication; and 3) lack of any legal or factual basis for granting injunctive relief.

Upon a motion to dismiss the complaint for lack of jurisdiction over the subject matter, the court must accept as true all undisputed allegations of fact made by the plaintiff. *Scheuer v. Rhodes*, 416 U.S. 232, 236, 94 S.Ct. 1683, 1686, 40 L.Ed.2d 90 (1974). However, the burden of proving jurisdiction rests with the plaintiff. *Reynolds v. Army & Air Force Exchange Serv.*, 846 F.2d 746, 748 (Fed.Cir.1988) (citing cases).

#### 1. Subject matter jurisdiction

A & T argues that although a contractor in a pre-award bid protest may rely on an implied contract to consider bids fairly as the basis for a claim, this contractor failed to do so. Rather, A & T asserts that plaintiff merely speculates when it states that a second round of BAFOs would lead to an improper auction.

■ Although the issue of reopening negotiations in order to accept a new round of BAFOs, after a successful, responsible contractor had been identified and after that

contractor's proposed cost had been disclosed, is apparently one of first impression in the Claims Court, the GAO has dealt with similar situations in the past. These GAO opinions are not binding on this tribunal, 31 U.S.C. § 3554(b) (1988), *e.g., Burroughs*, 223 Ct.Cl. at 63, 617 F.2d at 597, but such decisions "when reasonable and persuasive" provide useful guidance to the court. *CACI Field Servs., Inc. v. United States*, 13 Cl.Ct. 718, 731 n. 28 (1987), *aff'd*, 854 F.2d 464 (Fed.Cir.1988)); *see Honeywell, Inc. v. United States*, 870 F.2d 644, 647–49 (Fed.Cir.1989)[9]

The GAO stated the general rule concerning auctions, as follows: "While ... [the predecessor to FAR § 15.610(e) ] does proscribe the use of auction techniques, we interpret this to apply to the negotiation tactic of indicating one offeror's price to another offeror during negotiations...." *Sperry Corp.*, 65 Comp.Gen. 715, 717–18 (1986) (citing *Youth Dev. Assoc.*, 85–1 CPD ¶ 126). "[W]here the reopening of negotiations is properly required, the prior disclosure of an offeror's proposal does not preclude reopening negotiations, and reopening does not constitute either improper technical leveling or an improper auction.... [T]he statutory requirements for competition take priority over the regulatory prohibitions of auction techniques and technical leveling...." *Unisys Corp.*, 67 Comp.Gen. 512, 515 (1988); *Honeywell Information Sys.*, 56 Comp.Gen. 506, 512 (1977).[10]

---

of the invitation that can be corrected or waived without being prejudicial to other bidders...."

**8.** Mr. Steckler was present and prepared to testify at the initial hearing in this proceeding, held on February 19, 1991.

**9.** *Honeywell* progressed from the GAO to the Claims Court to the Federal Circuit. Concerning the stature of GAO in the procurement process, the Federal Circuit stated: "The GAO plays an important role in the resolution of contested procurement decisions...." 870 F.2d at 647 (citations omitted). In passing the 1984 Competition in Contracting Act, 31 U.S.C. §§ 3551–56 (1988), "Congress recognized and strengthened the GAO's involvement in the procurement process...." *Id.* at 648. The appellate court in *Honeywell,* in reversing the Claims Court's decision which rejected out-of-hand the GAO's hold-

ing, stated that "[t]he court ... failed to give appropriate deference to the GAO's conclusion...." *Id.* at 649. Accordingly, a trial court should not overlook decisions of the GAO, especially when, as here, the sources of insight are scarce. As evidence of their persuasiveness and acceptability, the parties cited and relied on numerous GAO decisions.

**10.** In considering the appropriateness of an agency's taking remedial action, such as reopening negotiations, the GAO considers the following factors: "the seriousness of the procurement deficiency, the degree of prejudice to the other offerors or the integrity of the competitive procurement system, the good faith of the parties, the extent of performance, the cost to the government, the urgency of the procurement, and the impact on the user agency's mission." *Sperry,* 65 Comp.Gen. at 717.

■ Auctions are not *per se* improper. "[T]here is nothing inherently illegal in the conduct of an auction in a negotiated procurement...." *Faxon Co.*, 67 Comp.Gen. 39, 43 (1987). FAR § 15.610(e) states only that an auction "may" violate applicable regulations. "[G]enerally the risk of an auction is secondary to the need to preserve the integrity of the competitive procurement system through appropriate corrective action...." *Contact Int'l Corp.*, 90–1 CPD ¶ 481, at 5 (citation omitted).

In *Microlog Corp*, 90–1 CPD ¶ 227, the GAO sustained the protest of a disappointed bidder which complained that the agency improperly conducted post-BAFO discussions with only one bidder. The GAO stated: "It is a fundamental principle of federal procurement that all offerors must be treated equally...." *Id.*, at 5 (citation omitted).

The GAO addressed a purported auction in *General Projection Systems*, 70 Comp. Gen. ——, 90–2 CPD ¶ 473. That case involved a protest by General Projection Systems ("GPS"), the apparent successful offeror, which complained that the agency improperly reopened discussions and requested a second round of BAFOs. GPS's proposed price remained confidential. The agency reopened negotiations after it determined that all offerors had not been privy to the same information. GPS immediately filed its protest with the GAO, arguing that the second round of BAFOs prejudiced GPS's competitive advantage by creating an opportunity for the other offerors to lower their prices. In finding that no auction took place, the GAO stated:

> [T]he usual sequence of events in a negotiated procurement includes at least one request for revised offers.... Even where, as here, there is information available, at the time the competition is reopened, that a certain firm was in line for award based on initial proposals, the [second] request for BAFOs does not give rise to an improper auction absent a price leak or some other disclosure. *Braswell Shipyards, Inc.*, ... [89–1 CPD ¶ 3]....

90–2 CPD ¶ 473, at 2 (citations omitted).

*Data Systems Division of Litton Systems*, 82–2 CPD ¶ 297, presents a situation wherein the agency rejected Litton, the low-price offeror, on three grounds: 1) that Litton failed to address adequately a time frame for completing equipment design; 2) that Litton's request for certain equipment was unreasonable; and 3) that Litton changed the scope of items included in a quality assessment report and, therefore, was technically unacceptable. Litton, the low-price offeror, protested, arguing that the agency lacked a rational basis for not accepting the bid because the alleged variations were so immaterial that Litton should have been allowed to cure its proposal. The GAO agreed, finding that the agency did not have a "substantial basis" for rejecting Litton's proposal. *Id.* at 4. The GAO stated further that, while some differences did exist between the contract requirements and the proposal, it could not find that the variations were "so material as to justify the determination that the ... [proposal] was unacceptable...." *Id.* at 6. Based on the fact that Litton "essentially" met the contract requirements, "[a]ny doubts concerning Litton's response easily could have been resolved by clarification.... Because reopening of discussions most likely would result in an auction, we think the appropriate course is for the ... [agency] to hold 'touch up' negotiations with Litton for the purpose of confirming that Litton will, in fact, ... [perform as required]...." *Id.* at 6–7.

*A. Denison Weaver*, Comp.Gen. B–171015.1 (July 13, 1971), concerned the inadvertent disclosure of the bid prices of the two offerors before award of the contract. In light of disclosure, the agency decided to "conduct negotiations only if absolutely necessary and then only ... in order to avoid an auction technique." Only limited negotiations concerning the use of foreign flag vessels were undertaken. The disappointed bidder protested, urging that the agency erred by failing to conduct meaningful negotiations. The GAO did not agree and denied the protest, stating that while "further negotiations should have been undertaken, we cannot say that ... [the agency] was patently unjustified in

making every effort to avoid a prohibited auction technique...."

Acknowledging that the preceding GAO opinions are not binding upon the Claims Court, this court finds their rationale to be reasonable and persuasive. Viewed together, these GAO decisions instruct that a prohibited auction may occur if an agency reopens discussions and calls for further BAFOs after disclosure of an apparent successful offeror's price, but only if the prejudice to the disappointed offeror outweighs the broader goal of maintaining procurement integrity. This circumstance depends on whether the agency expresses substantial concerns regarding the sufficiency of the proposal. Minor variations between the terms in the RFP and the terms in a bidder's proposal, standing alone, would not be so substantial as to permit an agency to reject the proposal. If such variations do exist, the agency should clarify the bidder's proposal. Only if the variances between the bidders' proposals and the requirements of the RFP are material should an agency forego clarifications and reopen negotiations with all bidders in the competitive range. The validity of any procurement rests on the assumption that all offerors receive identical treatment. Finally, after disclosure of bid prices, an agency may limit subsequent discussions in order to avoid use of the auction technique.

■ The court concludes that an improper auction would occur if, absent a rational or reasonable basis for deeming that the offerors fell short of meeting the Navy's needs in this procurement, *i.e.*, if it was not clear that information available was inadequate reasonably to justify contractor selection, FAR § 15.611(c), NUSC were to act on its intention to reopen negotiations and accept new BAFOs. With the disclosure of plaintiff's proposed cost, which plaintiff averred to be its lowest possible proposed cost, plaintiff lost its competitive advantage. In that circumstance NUSC's actions would violate FAR § 15.610(e)(2) which discourages conduct identical to that which occurred in this case: NUSC, after initially determining that plaintiff was the successful offeror, disclosed the amount of plaintiff's offer and then expressed its desire to reopen negotiations. A & T and/or Sonalysts, knowing plaintiff's lowest bid, could then restructure their proposed costs downward to ensure award of the contract. Because plaintiff is ignorant of the proposed costs of its two competitors, such conduct would violate the bastion of federal procurement policy that all offerors must posses equal knowledge of the same information in order to have a valid procurement.

In such a situation plaintiff would not receive full and fair consideration of its bid. Plaintiff's having pleaded violation of this implied-in-fact contract places the case within subject matter jurisdiction of the Claims Court.

### 2. Ripeness

■ A & T contends that since NUSC has not yet requested new BAFOs and because the structure of the intended BAFOs remains unknown, plaintiff cannot state with certainty that new BAFOs will lead to an improper auction. Since no dispute has arisen to date, A & T argues that plaintiff's claim is premature.

A & T cites *FTC v. Standard Oil Co. of California,* 449 U.S. 232, 101 S.Ct. 488, 66 L.Ed.2d 416 (1980), for the proposition that dismissal of a claim is required "if raised prior to the agency action that would give rise to a dispute." A & T's Br. filed Feb. 21, 1991, at 5. *Standard Oil* involved the issuance by the FTC of a complaint against respondent. While the complaint was still pending before the Administrative Law Judge ("ALJ"), respondent filed suit for declaratory judgment in federal district court in an attempt to require the FTC to withdraw its complaint. The Supreme Court ruled that "[b]ecause ... issuance of a complaint ... is not 'final agency action' under § 10(c) of the APA [Administrative Procedure Act], it is not judicially reviewable before administrative adjudication concludes...." 449 U.S. at 246, 101 S.Ct. at 496 (footnote omitted). Accordingly, the Court upheld dismissal of the complaint.

Unlike this case the outcome of *Standard Oil* depended largely upon the appli-

cability of the APA. More importantly, the ALJ, not the FTC, controlled future agency action—the FTC's prospective conduct was dependant upon the outcome of the administrative litigation. Such is not the case at bar, wherein the Navy is a self-determining body. NUSC, after retracting its contract award to plaintiff, decided to reopen negotiations and accept new BAFOs. NUSC need not obtain prior approval of its conduct from an ALJ or any authority before it may act. Rather, only subsequent action by the GAO or this court can prohibit NUSC from undertaking its intended action.[11]

That plaintiff may "re-win" contract award upon evaluation of new BAFOs is immaterial.[12] NUSC, having previously declared plaintiff the successful offeror, may not require plaintiff to undertake the time, expense, and risk of resubmitting its bid without a rational or reasonable basis for doing so. To force plaintiff into submitting a new BAFO would prejudice plaintiff by requiring it to compete again for that which the agency previously determined plaintiff won with its first proposal.

Contrary to A & T's argument, such agency conduct creates a dispute. Standing alone, the retraction of contract award to plaintiff presents sufficient controversy so as to rise to the level of a dispute. *See P. Francini & Co.,* 2 Cl.Ct. at 10 (after exposure of protestors' bids to their competitors, protestors suffered a competitive disadvantage in the next round of BAFOs). Plaintiff's contract was taken from it. Plaintiff has the right to have this agency action presented to a court.

*Turner International, Inc.,* 88–2 CPD ¶ 434, although not precisely on point, is instructive. Turner, the original low-price offeror, waited too long to protest the agency's decision to accept new BAFOs. After an initial round of BAFOs, the agen-cy decided that all three proposals within the competitive range were unacceptable. New negotiations and a second round of BAFOs ensued, but only after a third party disclosed the prices of the three offerors. After award to another contractor, Turner protested that the new BAFOs constituted an auction and that the contract should have been awarded to it based on the first round of negotiations.

The GAO disagreed and denied the protest. As grounds for its decision, the GAO stated that its bid protest regulations require that Turner protest the request for new BAFOs before the closing date. Since Turner chose to wait until after award to a competitor, its protest was untimely. The GAO further stated: "It is not fair to the other offerors to permit Turner to submit its BAFO along with the others and then after it is not selected for award to complain that BAFOs should not have been called for at all. *Research Analysis & Management Corp.,* ... 85–2 CPD ¶ 524." 88–2 CPD ¶ 434, at 3.

Although based in part on regulations inapplicable here, *Turner* instructs broadly that an offeror runs a great risk if it delays in protesting a decision to reopen negotiations and accept new BAFOs. Plaintiff in this case avoided such risk by timely filing its suit.

### 3. Plaintiff's alleged failure of proof

■ In support of dismissal for lack of a factual or legal basis on which the court may grant relief, A & T argues that plaintiff failed to demonstrate that it will suffer irreparable injury; that plaintiff has an adequate remedy at law; and that the public interest will be served only by allowing NUSC to correct the procurement by accepting new BAFOs.

Plaintiff will suffer irreparable injury in the form of lost profits if it is not awarded

**11.** A & T also cites *Toilet Goods Ass'n., Inc. v. Gardner,* 387 U.S. 158, 87 S.Ct. 1520, 18 L.Ed.2d 697 (1967), for the same proposition as *Standard Oil.* Both are distinguishable on the facts and on the law.

**12.** In view of Mr. Steckler's affidavit, such a supposition is suspect. Plaintiff cannot lower its bid, and A & T and Sonalysts, with the double benefit of receiving a higher technical score in the first BAFO and knowing plaintiff's lowest possible proposed cost, can structure their proposals in a manner assuring either contractor of contract award. (A & T failed to aver that it cannot lower its proposed cost.)

the contract. *Quality Transport*, 12 Cl.Ct. at 282; *Essex Electro Engineers, Inc. v. United States*, 3 Cl.Ct. 277, 287 (1983). A & T characterizes plaintiff's position as premature because the low offeror cannot be identified until each responds to the request for BAFOs. By presupposing that the offerors may change their key personnel in such a manner that the offerors' pricing may change, A & T's argument flounders as speculative itself. Mr. Steckler's affidavit sufficiently details that plaintiff cannot lower its proposed cost under the BAFO as written.

No adequate remedy at law is available. An action at law will not avail plaintiff because it could only provide plaintiff with recoupment of bid preparation costs in a suit for damages. *Essex Electro*, 3 Cl.Ct. at 287 (citing cases).

A & T's contention that the public interest would be served only by letting NUSC reopen discussions has merit and will be discussed in conjunction with resolving defendant's motion for summary judgment.

IV. *Defendant's motion to dismiss or, in the alternative, for summary judgment*

According to defendant NUSC only reopened negotiations after it determined that plaintiff failed to meet key personnel requirements found in the RFP. Since A & T and Sonalysts were similarly deficient in their proposals, NUSC conducted discussions with these offerors, as well. Once negotiations were reopened properly, FAR § 15.611(c) obligates NUSC to issue a new request for BAFOs. Because a request for new BAFOs is valid, an improper auction would not result even though plaintiff's price was disclosed. Therefore, defendant concludes, NUSC's actions were rational or reasonable and in accord with regulations.

1. Summary judgment standards

Summary judgment is appropriate when there are no genuine issues of material fact in dispute and the moving party is entitled to judgment as a matter of law. RUSCC 56(c). Only disputes over facts that are material or that might significantly affect the outcome of the suit under the governing law will preclude an entry of judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). A dispute about a material fact is genuine if the evidence would permit a reasonable jury to return a verdict in favor of the non-movant. *Id.* As moving parties, both plaintiff and defendant have the burden of establishing that no genuine material issues are in dispute and that the movant is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986). In contesting the opposing party's motion, each litigant has the burden of providing sufficient evidence, not necessarily admissible at trial, to show that a genuine issue of material fact indeed exists. *Celotex*, 477 U.S. at 322, 324, 106 S.Ct. at 2552, 2553–54. In this case the record consists of pleadings, answers to interrogatories, affidavits, and documents detailing the proceedings before NUSC and the GAO.

To create a genuine issue of fact, the non-movant must do more than present *some* evidence on an issue it asserts is disputed. The Court stated:

> [T]here is no issue for trial unless there is sufficient evidence favoring the non-moving party for a jury to return a verdict for that party. If the evidence [of the movant] is merely colorable, or is not significantly probative, summary judgment may be granted.

*Avia Group Int'l, Inc. v. L.A. Gear California, Inc.*, 853 F.2d 1557, 1560 (Fed.Cir. 1988) (emphasis in original) (quoting *Anderson*, 477 U.S. at 249–50, 106 S.Ct. at 2510–11 (citations omitted), and citing *Celotex*, 477 U.S. at 322–23, 106 S.Ct. at 2552–53, and *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87, 106 S.Ct. 1348, 1355–56, 89 L.Ed.2d 538 (1986)).

In resolving the cross-motions, the court cannot weigh the evidence and determine the truth of the matter on summary judgment. *Anderson*, 477 U.S. at 249, 255, 106 S.Ct. at 2510–11, 2513–14. Any evidence

presented by the non-movant must be accepted as true and all justifiable inferences are to be drawn in its favor. *Id.* at 255, 106 S.Ct. at 2513–14. In respect to any material facts, contested or uncontested, the rule applies that each party, in its capacity as the opponent of summary judgment, is entitled to "all applicable presumptions, inferences, and intendments." *H.F. Allen Orchards v. United States,* 749 F.2d 1571, 1574 (Fed.Cir.1984), *cert. denied,* 474 U.S. 818, 106 S.Ct. 64, 88 L.Ed.2d 52 (1985).

Summary judgment pursuant to RUSCC 56 properly can intercede and prevent trial if the movant can demonstrate that trial would be useless in that more evidence than is already available in connection with its motion could not reasonably be expected to change the result. *Pure Gold, Inc. v. Syntex (U.S.A.), Inc.,* 739 F.2d 624, 626 (Fed.Cir.1984). Summary judgment is not a disfavored procedural shortcut but, rather secures the speedy and inexpensive determination of every suitable action. *Celotex,* 477 U.S. at 327, 106 S.Ct. at 2554–55 (quoted in *Avia Group Int'l,* 853 F.2d at 1560, and *Sweats Fashions, Inc. v. Pannill Knitting Co.,* 833 F.2d 1560, 1562 (Fed.Cir. 1987)). However, a trial court may deny summary judgment if "there is reason to believe that the better course would be to proceed to trial." *Anderson,* 477 U.S. at 255, 106 S.Ct. at 2513–14 (citation omitted).

2. Whether NUSC's decision to reopen discussions was rational or reasonable and in accordance with applicable regulations

Initially, defendant argues that the February 6, 1991 letters' request for a response regarding certain "informational deficiencies" in the proposals constituted discussions, not clarifications. Defendant asserts, this distinction is crucial to this litigation. Clarifications may be undertaken with only one offeror, but discussions must be conducted with every offeror in the competitive range. *See Blue Cross and Blue Shield of Maryland v. HHS,* 718 F.Supp. 80, 87 (D.D.C.1989) (citing GAO opinions).

Next, defendant asserts that since the education and experience qualifications of the key personnel are material terms of the RFP, *see* ¶¶'s H40(a) and L31(b)(1), *supra* p. 778, plaintiff's failure to meet these requirements is not a "minor irregularity, informality, or apparent clerical mistake," the hallmark for "clarification," FAR § 15.601, but "involves information essential for determining the acceptability of the proposal," that of "discussions." *Id.* Since FAR § 15.607 instructs that communications to settle minor irregularities are clarifications, argues defendant, the February 6, 1991 letters constituted discussions.

Defendant's argument is conclusory. In order to reach the conclusion that discussions occurred, or should occur, defendant must first establish that plaintiff failed to satisfy the key personnel requirements of the RFP.

The views of NUSC on this point are inconsistent. Throughout the evaluation process, the TEP took the position that plaintiff's EW experience was weak and, accordingly, gave plaintiff the lowest technical rating of the three offerors, but overall found plaintiff acceptable. Based on a combination of cost and technical factors, the TEP determined that plaintiff was the successful offeror. On that basis NUSC decided to award the contract to plaintiff and initially urged the GAO to dismiss the protest of A & T. As recently as January 18, 1991, Mr. Comstock reaffirmed the decision to award to plaintiff.

Within seven days NUSC changed its position. On January 25, 1991, during the pendency of A & T's protest, Contracting Officer Cannata decided to reopen negotiations and accept new BAFOs. On February 6, 1991, Mr. Cannata sent a letter to all three offerors requesting information concerning certain "informational deficiencies."

Only two record entries address the reasoning underlying the finding that plaintiff's proposed key personnel did not meet the RFP requirements. [There follows a detailed account of these two record entries. The first entry compares Mr. Comstock's February 19, 1991 evaluation, which found plaintiff's proposal to be unacceptable, with his earlier determination of

January 18, 1991, which found plaintiff's proposal to be acceptable. The second entry concerns defendant's response to one of plaintiff's interrogatories concerning ·NUSC's reasoning for reopening negotiations.]

Mr. Comstock's February 19, 1991 evaluation makes clear that, in NUSC's view, plaintiff's proposed personnel were inadequate. That this memorandum was written after the initiation of litigation does not detract from its probity, for two reasons. First, plaintiff filed suit² in this court while NUSC's review of the offerors' responses to the February 6, 1991 letters was ongoing. A frustrated bidder may not interpose its complaint so as to cut off an agency's preexisting plans to review the offerors' submissions. Second, this court stated in *Vanguard Security, Inc.* that "as a policy matter, the Government should not be forced to accept service contracts that understate its needs even if the under-statement was the Government's fault. The primacy of the procuring agency's assessment of its own needs and the penalty to the fisc transcend the harm to the frustrated bidder in losing the prospective contract." 20 Cl.Ct. at 109. This court considered that "the integrity of the procurement process would be undermined if defendant were not allowed to advance its *post hoc* justifications for the cancellation. While untimely, defendant's arguments concern the integrity of the procurement process. and the additional damage that would be occasioned if the award were made on the IFB [Invitation For Bids] as issued." *Id.* at 111.[13]

■ The court has reviewed the PDFs and PQSs, the February 6, 1991 letters and the offerors' responses, and the February 19, 1991 memorandum of Mr. Comstock. Based on this material, the court finds as rational and reasonable the contracting officer's determination that plaintiff's proposal was inadequate. Viewed most favorably to plaintiff, its proposal did not affirmatively meet the RFP's requirements, specifically, the requirement of the ·PQSs for specialized submarine experience in EW or specialized EW experience. Consistent with FAR § 15.611(c), the contracting officer had a rational basis for determining that it is clearly in NUSC's interest to reopen negotiations, after initially deciding to award contract to plaintiff and after disclosing plaintiff's proposed cost. · Although the reversal of position regarding the adequacy of plaintiff's personnel does give the court pause, the court is unable to conclude that the contracting officer acted irrationally or unreasonably, thereby violating FAR § 15.611(c). Since the agency's needs were not met by plaintiff's proposal, the agency is not required to accept personnel who do not appear to meet its minimum requirements.

Plaintiff places great reliance on *Columbia Research Corp.*, 87–2 CPD ¶ 295 and 88–1 CPD ¶ 164 (on reconsideration), a case involving award of a contract by NUSC under an RFP to Aquidneck. Due to a $2.65 million cost advantage for Aquidneck over Columbia, and to only a slightly higher technical score for Columbia, the contracting officer awarded the contract to Aquidneck. Columbia protested, asserting, *inter alia*, that Aquidneck's proposed personnel failed to satisfy the minimum education and experience requirements of the RFP.

The GAO denied the protest, stating that while two of Aquidneck's proposed person-

---

**13.** *Prineville,* 859 F.2d 905, stands for the proposition that, in certain circumstances, an agency may not cancel an invitation for bids, even when the agency's needs are not met precisely. The case concerned the sale of salvage timber through sealed bidding. The total price of each bid was calculated by multiplying the bid rate times the agency's estimated volume of timber. The agency's original estimate of the amount of timber offered for sale was erroneous. In *Prineville,* the court determined essentially that since appellant's bid, based on this original esti-

mate, was not grossly inaccurate, the agency would have to accept appellant's bid. Here, however, the presumption to be made in a close case favors nonacceptance by NUSC. The terms of the Source Selection Plan, which must be followed by all evaluators, states that "any ambiguous or vague treatment of an RFP minimum requirement shall be labelled a deficiency." In this case, then, a bid that approximates the NUSC's requirements is insufficient. Conformity is a prerequisite for acceptance.

nel for the systems engineering position had B.S. degrees in Mathematics rather than in science or engineering, as required in the RFP, this minor deviation did not impact contract award. Columbia was not prejudiced by this deviation because, even if Columbia knew of the relaxation in time to change its proposal accordingly, similar changes in its personnel could not have lessened significantly Aquidneck's $2.65 million cost advantage.

Plaintiff asserts that since NUSC in *Columbia* defended award of a contractor which did not meet the RFP's minimum requirements, it should not be permitted to argue the reverse in this case. Moreover, according to plaintiff, the minimum education requirements at issue in *Columbia* correlate exactly to the minimum experience requirements at issue here. If NUSC waived the education requirements in *Columbia,* so too, should it waive the experience requirements in the procurement.

As an initial matter, the court does not know the nature of the requirements of the RFP before the contracting officer in *Columbia.* No evidence in the GAO's decision informs how "minimum" were the "minimum" educational requirements. The contracting officer in *Columbia* may well have had a rational basis for determining that Aquidneck's BAFO represented the most advantageous offer to NUSC, despite the deviations from the RFP. This court has not been made aware of A & T's and Sonalysts' proposed costs. Therefore, no similar analysis of prejudice can be undertaken. It may well be that, although A & T's and Sonalysts' proposed costs are significantly higher than plaintiff's, a reworking of their bid prices could reduce significantly the differences in the range of bids.

Plaintiff failed in its attempt to demonstrate that its proposed key personnel satisfied the experience requirements of the RFP or to raise a genuine issue in respect of the rationality or reasonableness of NUSC's determination that the personnel were deficient. By pointing out that EW is undefined in the RFP and by offering several published definitions for EW, plaintiff managed only to offer an alternative inter-

pretation of the experience requirements, which does not stress submarine experience as a *sine qua non* of EW experience. Due to the large measure of discretion afforded a contracting officer in a negotiated procurement, the court is unwilling to accept plaintiff's interpretation over that of the contracting officer absent a valid reason for doing so. Since plaintiff provided no such reason, it did not demonstrate that Mr. Cannata acted irrationally or unreasonably when he decided to reopen negotiations.

■ Whether or not the February 6, 1991 letters constituted discussions or clarifications is not determinative. The proper inquiry devolves to whether plaintiff's proposal satisfied NUSC's mandatory requirements for key personnel. If NUSC's needs were not met by the offerors' proposals, then the agency could, and should, reopen negotiations. An agency has the right to retain a service contractor that will meet its needs. Moreover, it cannot be gainsaid that the court's proper function in reviewing a determination to reopen negotiations is not whether the plaintiff contractor satisfied the requirements of the RFP, which would enshrine the court as a super-Technical Review Panel, but whether the contracting officer rationally or reasonably determined that the information provided by plaintiff was inadequate to make a selection given the requirements of the RFP. The discretion accorded the contracting officer allows him to consider that information available is inadequate to reasonably justify contractor selection, even if the protesting contractor could make out a case in court, with additional documents and testimony, that it satisfied the requirements.

3. Improper auction

■ A holding that the contracting officer had a rational or reasonable basis for reopening negotiations does not end this court's inquiry. Even with such justification, a prohibited auction may result under certain circumstances.

The GAO has held that the letter of FAR § 15.610(e)(3) is violated only when one offeror's price is disclosed to another offeror

during negotiations. When a second round of negotiations are proper, the disclosure of an offeror's bid price will not transform the procurement into an impermissible auction. *See Unisys,* 67 Comp.Gen. at 515 and *Sperry,* 65 Comp.Gen. at 718. Since plaintiff's proposed personnel failed to satisfy the terms of the RFP and did not meet NUSC's requirements, the reopening of negotiations is proper and will not lead to a technical violation of the auction regulation.

However, an agency may comply with the letter of a regulation but still violate its spirit. New discussions leading to new BAFOs may violate the spirit of the auction regulations when the prejudice to the disappointed contractor outweighs the need to maintain the integrity of the procurement process. Such a showing is difficult, because the danger of an auction is subordinate to maintaining procurement integrity by corrective action. *E.g., Contact Int'l,* 90–1 CPD ¶ 481.

The GAO addressed a situation similar to the present case in *FCC.O & M, Inc.,* Comp.Gen. B–238610.2 (July 20, 1990). This case involved an earlier protest before the GAO by Sterling, one of FCC.O & M's competitors. Sterling's protest questioned FCC.O & M's responsibility as a contractor, asserting that FCC.O & M did not satisfy the minimum manning requirements. During the pendency of the protest, the Air Force became aware of an ambiguous specification concerning a manning requirement in the RFP. A written statement by the contracting officer, made pursuant to the protest, found that FCC.O & M was the apparent successful offeror and disclosed the bid prices of FFC.O & M and Sterling.

Once aware of the ambiguous specification, the Air Force amended the RFP, thereby rendering the protest moot, reopened discussions, and requested new BAFOs. FCC.O & M argued that reopening discussions after disclosing the competitors' prices created an impermissible auction and asserted that it should receive award of the contract based on its original proposal.

In essence, FFC.O & M contended that preventing an auction took precedence over reopening discussions. The Air Force countered that, since FCC.O & M's proposal was nonconforming, further discussions were essential. FCC.O & M relied on *American Elec. Laboratories, Inc.,* 65 Comp.Gen. 62 (1985), a case wherein, due to disclosure of prices, the GAO avoided an auction by allowing the procurement to continue without reopening negotiations that would have given the protestor a chance to correct a mistake in its price proposal. In distinguishing *American Elec.,* the GAO in *FCC.O & M* stated:

> In *American Elec* ..., it was clear that the proposed award would meet the government's needs; here, in contrast, without correction of the omission from FCC.O & M's proposal—which may only be done through discussions—award of a contract to FCC.O & M would not meet the government's needs. In these circumstances, we think that preserving the integrity of the competitive system through reopening discussions clearly takes precedence over the risk of an auction due to disclosure of the offerors' prices. *See Contact Int'l,* ... 90[–1] CPD ¶ 481.

Plaintiff failed to prove that the harm it would realize due to a reopening of negotiations, after disclosure of its proposed cost, would exceed the harm to the procurement process if negotiations were not reopened. Plaintiff alleges that since the proposed cost it submitted with its BAFO is its lowest possible proposed cost, disclosure of this price eliminated its competitive advantage. Plaintiff argues further that its competitors will lower their prices in the new BAFOs, thereby creating the likelihood that the contract will be given to either A & T or Sonalysts. The court agrees that plaintiff's competitive advantage has been lessened to some degree. Whether plaintiff is incapable of winning contract award pursuant to a new round of BAFOs remains to be seen. This potential harm, however, is insufficient to overcome the damage that NUSC certainly would suffer if it were forced to accept plaintiff's nonconforming personnel. Since the harm to

the procurement takes precedence over the risk of auction, the spirit of the regulation would not be violated by reopening negotiations and accepting new BAFOs.

For these reasons, defendant's motion for summary judgment is granted and plaintiff's cross-motion is denied.

## V. *Remedial measures*

■ Defendant represented in argument held on March 18, 1991, and in brief that the offerors would be permitted to revise their technical proposals to meet NUSC's personnel requirements. *E.g.*, Def's Br. filed Mar. 6, 1991, at 18–19 (if negotiations were to proceed, NUSC would allow offerors to rewrite their proposals to meet the RFP's requirements), *see id.* at 23; Def's Br. filed Mar. 15, 1991, at 20 (NUSC intends to rescore the technical evaluation if the offers' respond with new hires). NUSC should also undertake remedial action by conducting only limited negotiations. To preserve the integrity of the procurement process, these negotiations should be limited to addressing the "informational deficiencies" noted in Contracting Officer Cannata's February 6, 1991 letters. Any amendments of proposals should correspond precisely to the scope of these limited discussions. Similarly, with respect to the request for a second round of BAFOs, any pricing change made by an offeror should be related directly to changes made in response to the same February 6, 1991 letters.

Defendant and A & T presented no authority for the proposition that full-scale negotiations are mandatory in a situation, such as this case, wherein one offeror's price was disclosed and wherein the agency questioned only a finite number and type of personnel. In contrast, *A. Denison Weaver* compels the conclusion that an agency may properly limit the scope of negotiations. In *Weaver* the agency disclosed prices prior to contract award. In order to avoid an auction technique, the agency conducted only limited negotiations. The GAO did not find error in the decision to conduct only partial negotiations, stating that the agency was not "patently unjustified" in taking protective measure to avoid an auction. *See Corbetta Constr. Co.*, 55 Comp. Gen. 201, 218 (1975) (citing *Weaver* with approval).

The GAO decision in *Litton* also supports the propriety of limited negotiations. In that decision the differences between Litton's proposal and the requirements of the RFP were not material. In recommending that the agency terminate the contract and award it to Litton, the GAO stated: "Because reopening discussions most likely would result in an auction, we think the appropriate course is for the ... [agency] to hold 'touch up' negotiations with Litton for the purpose of confirming that Litton will ... [perform as required]...." *Litton*, 88–2 CPD ¶ 297 at 7.

These GAO decisions, along with the maxim that a valid procurement rests on the assumption that all offerors are treated equally, should provide NUSC with strong direction for structuring negotiations in the manner suggested above. If NUSC complies with this suggestion, it will be acting consistently with sound and fair procurement policy.

## VI. *Showings for injunctive relief*

■ To show an entitlement to an injunction, plaintiff must make three additional showings: (1) that it will suffer specific irreparable injury if the procurement is not enjoined; (2) that the harm to be suffered by it outweighs the harm to the Government and third parties if the procurement is enjoined; and (3) that granting of the relief serves the public interest. *Washington Metropolitan Area Transit Comm'n v. Holiday Tours*, 559 F.2d 841, 842–43 (D.C.Cir.1977).

Plaintiff has shown that it would be irreparably injured if injunctive relief were not granted in the form of lost profits on any contract awarded to another offeror. Granting injunctive relief to plaintiff, however, would prejudice the other offerors, since Sonalysts, like plaintiff, has not proposed key personnel who satisfy NUSC's mandatory minimum requirements. Finally, the public interest in making procurement dollars available to qualified contrac-

tors; in obtaining services at the lowest cost consistent with procurement needs; in avoiding unfair auction techniques, such as continuing negotiations after one offeror's proposed cost has been disclosed; and in assuring that the agency has the discretion to accept offerors that meet mandatory requirements in a RFP is served by allowing NUSC to continue discussions to resolve its personnel needs and by allowing the offerors to adjust their BAFOs to reflect changes in key personnel, even though plaintiff's proposed cost has been disclosed. The prohibition against auctions will not be violated in letter or spirit in that plaintiff's proposal did not satisfy certain mandatory requirements of the RFP.

### CONCLUSION

Accordingly, based on the foregoing, defendant's motion for summary judgment is granted; defendant's motion to dismiss is denied; plaintiff's cross-motion is denied; and intervenor's motion to dismiss is denied, except insofar as it is consistent with defendant's motion for summary judgment. The Clerk of the Court shall dismiss the complaint.

IT IS SO ORDERED.

No costs.